## RILEY *v.* STATE

No. 42468 November 4, 1963 157 So. 2d 381

*W. P. Mitchell,* Tupelo; *Guy N. Rogers,* Jackson, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

JONES, J.

In the Circuit Court of Lee County appellant was indicted for murder, convicted of manslaughter, and sentenced to twelve years in the penitentiary. We think the conviction should be, and it is, affirmed.

Appellant says the lower court erred (1) in not granting a mistrial because of alleged prejudicial argument by the district attorney; (2) in allowing the State to reopen after both sides had rested and to offer additional

evidence; (3) in granting the instruction authorizing conviction of manslaughter; and (4) in overruling appellant's motion for a new trial on the ground that the verdict was against the overwhelming weight of the evidence.

It would appear that both the defendant and the deceased were engaged in bootlegging. They were married to sisters. The State's evidence showed that sometime in the early morning of January 6, 1962, at approximately 12:30 or 1:00 A.M., Mr. Bolin Kidd was awakened by gun shots coming from the west of his house. He lived about one mile west of Shannon, about 150 or 250 yards north of the Pontacola Road. His house faced south. He and his family were asleep when, as stated, he was awakened by these gun shots. He got up and opened the door, and when he did he saw Grubbs in front of his house with his hands above his head; the appellant was facing him with a shotgun held about hip high, with his left hand on the gun. The evidence showed that appellant was left-handed. The deceased, Grubbs, said, "Mr. Kidd, don't let him shoot me; he is fixing to shoot me." Kidd remonstrated with appellant, asking him not to shoot, but appellant just stood there for a minute or so, then he lunged toward Grubbs and shot him. He shot him while Grubbs' hands were still raised over his head and empty. From this shot, Grubbs died.

Mr. Kidd's son was near Grubbs at the time, and Carl Murphy, Jr., who had come to the scene with Riley, knocked him down. Then Murphy and appellant backed around to the pickup truck. There was a car in the driveway with its lights burning. This car was west of the house, headed toward the house.

Mr. Kidd, whose testimony was as stated, was corroborated to a great extent by his wife. While she did not see the actual shooting, she heard the guns which awakened Kidd, and heard the conversation outside.

The State also introduced Grady Gable who worked for deceased at his place near Tupelo. He said Grubbs left his place and later called by phone. Witness answered the phone and was told to call Billie Rex Kidd, another employee. He did so and Kidd said Grubbs wanted them to come down and help protect him to get back home. He and Billie Rex Kidd went to Ma Edwards' place, another bootleg place, and Grubbs was there. They carried a shotgun and a pistol with them. After they arrived at the Edwards' place, they got in a pickup truck and started home. Witness did not know of his own knowledge why they had the guns except that witness was told to "help get me home." Grubbs was driving the truck, and when it started pulling out a car followed them. They turned in at Mr. Bolin Kidd's house and the car also turned. Witness said he did not know who was following them. The truck pulled into Mr. Kidd's yard and stopped by the house near the east end of the porch; the car stopped near the west end of the driveway. When the pickup truck stopped, Grubbs and Gable got out, and started running, and someone hollered, "You better stop." Witness said they ran behind the house and "they" started shooting. Witness and his companions went around one corner of the house and appellant came around the other way. When back of the house, witness said "He swung at me and I fell." Then Grubbs turned and went the other way, the appellant followed. Witness did not immediately get up but said he heard them around the front of the house, heard the mumbling going on, and then heard a gun shot. He stayed where he was until somebody in the car said, "Let's go," and the car left. After they left, he walked around and saw Grubbs, who told him, "They shot me."

There is a sharp conflict in the evidence on the vital point of the shooting. Defendant and his witnesses testified that they drove up to Ma Edwards' place; that

Grubbs was there beside the truck and made a motion to them to follow him. They did follow the pickup truck and said when they got out of the car, someone in front of the truck was shooting at them. Carl Murphy was shot in the leg. Then they testified that J. W. Riley, appellant, picked up a gun from the back of his car and went around Kidd's house. He finally came upon Grubbs and Kidd standing in front of the truck. With his gun, he made them drop their guns, and while he was standing there telling Grubbs not to come closer, Mr. Kidd appeared at the door, and when Grubbs said something to Mr. Kidd, appellant turned his head toward him, and thereupon Grubbs lunged and caught the gun, causing it to discharge and kill him.

The State made out a case of murder and the defense was that the actual shooting itself was accidental. On cross-examination, David Scott, a witness for defendant, was asked whether or not approximately three months before this shooting, when he, Emmett Pickering, Imogene Cason, J. W. Riley and Grubbs, were at Grubbs' house, if he, Scott, didn't put a gun on Grubbs and tell him that if he did not buy all his whiskey from him that he was going "to put him in ashes", and turned around and asked J. W., "Isn't that right?" J. W. answered, "yes." The witness denied that any such thing had happened. Defendant's witnesses all claimed there was no trouble between Riley and Grubbs or them and they had not talked about doing him any harm, and had no reason to do him any harm.

On cross-examination, appellant was asked about the same conversation hereinbefore mentioned as having been asked of Scott, and appellant denied that it occurred. The appellant was also asked whether two or three days before this killing he saw Charles McBride at the 78-Fruit Stand, and told him that his brother-in-law (Grubbs) was a "son-of-a-bitch, and you had a score

to settle with him, and you were going to get him when you saw him.'' Appellant answered that he did not.

After both sides had rested, the following testimony was offered. The State argued that it was in rebuttal. Defendant argued that it was evidence in chief and would not be admissible in rebuttal. After some discussion the court permitted the State to reopen the case and put this evidence in the record. Emmett Pickering was introduced and testified to the statement by Scott at Grubbs' house which had been denied by Scott. Charles McBride was then introduced and testified to the occurrence at the 78-Fruit Stand, which had been denied by J. W. Riley.

After the last of these witnesses had testified, the defendant's counsel asked the court to indulge them a few minutes in order that they might see if they had any further proof. A short recess was taken and following the recess, the attorneys for defendant announced that defendant rested.

On the first assignment of error, the special bill of exceptions states that the district attorney, in his closing argument, made a statement to the jury, in substance, to the effect that defendant had prior to this trial applied for and had a hearing by way of habeas corpus to be granted bond, and that at said hearing bond pending trial was denied. The bill of exceptions states that objection thereto was made and that the court instructed the jury to disregard the statement, but overruled the motion for a mistrial. It is also alleged that the district attorney repeated words of the same substance, to which objection was promptly made, and the court again instructed the jury to disregard it, but a motion for mistrial was overruled.

On direct examination of the defendant by his own counsel, the following questions and answers were made and given:

"Q. I will ask you to tell the court and jury after James Grubbs was killed where you have been.

"A. After he was killed?

"Q. Yes, sir, have you been at liberty?

"A. No, sir."

Objection was made and sustained, and then the following occurred:

"Q. Are you now in jail, Mr. Riley?

"A. Yes, sir."

Again objection was made and the court said, "Go ahead," and the examination by defendant's own counsel continued.

"Q. Have you been in jail since this accident occurred?

"A. Yes, sir.

"Q. Have you been denied bond?

"A. Yes, sir."

It would seem that when the argument attacked was made, there was evidence of such facts in the record, and as was said by this Court in Nelms & Blum Co. v. Fink, 159 Miss. 372, 131 So. 817: "Counsel necessarily has and must have, to serve his function and office, a wide field of discretion. He may comment upon any facts introduced in evidence. He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language. . . . ."

While there is no record of vile or abusive language in this case, Judge Whitfield, in Gray v. State, 90 Miss. 235, 43 So. 289, said:

"District attorneys and prosecuting counsel representing the state, so long as their addresses to the jury are based upon and justified by the evidence in the cause, are not to have an indignation justly aroused against horrible crime iced down to the freezing point by too frigid a care, lest they transgress in the use of heated language. Fancy and reason may well have their full and legitimate play, however splendid the flights of

the one, and however terrible the logic of the other, if only that fancy and that reasoning exercise themselves within the scope warranted by the testimony in the case.''

''Counsel have very wide latitude in their arguments, and the court will not unduly restrain them in exercising their own conception of the course of the argument so long as the comment is upon facts in evidence. This matter of the great freedom allowed counsel is discussed in the case of Nelms & Blum Co. v. Fink, 159 Miss. 372, 131 So. 817, and it is stated in that opinion and in many others, at least as far back as Perkins v. Guy, 55 Miss. 153, 30 Am. Rep. 510, that counsel should not state facts that are not in evidence.'' Garrett v. State, 187 Miss. 441, 193 So. 452.

■■ ■ Therefore, this evidence having been introduced in the record by the defendant, even over the objection of the State, formed the basis for the statement made by the district attorney and he was not departing from the evidence when he made such statements. The court was correct in overruling the motion for a mistrial.

As to the second assignment of error regarding the State's reopening of the case, and the offering of additional evidence: The State was of opinion that the evidence intended to be offered was in rebuttal of the denials of such conversations and of the allegations of no bad feeling toward the deceased. The defendant claimed that it was evidence in chief and should have been offered in chief. The question was not free of doubt. The court finally agreed to reopen the case and permit the testimony to be entered. After the introduction of the testimony, the defendant requested a recess for consultation as to whether they might produce some other witness. The request was granted, and afterwards defendant returned into court and his counsel announced that defendant rested. He was given an opportunity to reply to the testimony if he saw fit.

We think this question has been before the Court numerous times. The matter of allowing either the State or the defense to reopen a case after it has rested is a matter addressed to the sound discretion of the trial court. Perkins v. State, 229 Miss. 299, 90 So. 2d 650. Permitting a murder case to be reopened to show deceased came to his death as a result of a bullet wound is not erroneous. Richardson v. State, 153 Miss. 654, 121 So. 284. In Roney v. State, 167 Miss. 827, 150 So. 774, Judge Griffith stated the rule as follows:

"That rule is that when the question is not free from doubt whether the evidence offered in rebuttal is that which belongs to the evidence in chief, or whether it is rebuttal evidence proper, the court should resolve the doubt in favor of the reception in rebuttal where (1) its reception will not consume so much additional time as to give an undue weight in practical probative force to the evidence so received in rebuttal, and (2) the opposite party would be substantially as well prepared to meet it by surrebuttal as if the testimony had been offered in chief, and (3) the opposite party upon request therefor is given the opportunity to reply by surrebuttal."

This case was followed and the rule further announced by Judge McGehee in Clark v. State, 181 Miss. 455, 180 So. 602: "It is not reversible error for the court to allow testimony in rebuttal which should have been introduced as substantative evidence in chief, unless it is shown that no opportunity is afforded the defendant to reply to surrubuttal testimony. Roney v. State, 167 Miss. 827, 150 So. 774, and other cases therein cited. In other words, the admission of such testimony rests largely within the sound discretion of the trial court."

And in Hunter v. State, 183 Miss. 779, 184 So. 835, the Court said: "Moreover, even if it were true that this testimony should have been offered in chief, it was not reversible error to permit the state to introduce the

same in rebuttal, where the defendant was not denied the opportunity to offer further testimony in surrebuttal. Roney v. State, 167 Miss. 827, 150 So. 774; Clark v. State, (Miss.), 180 So. 602.''

Both the Roney case and the Clark case were cited with approval and quoted in Gant v. State, 219 Miss. 800, 70 So. 2d 28. In the cases of Lee v. State, 201 Miss. 423, 29 So. 2d 211, and Sommerville v. State, 207 Miss. 54, 41 So. 2d 377, the State was permitted to reopen for the purpose of proving an element of the offense itself. See also McGarrh v. State, 148 So. 2d 494, Headnote 10.

 It is settled by these cases and others that the assignment of error just mentioned is not well taken, since there was no abuse of discretion by the lower court.

 █ As to the third assignment: Appellant concedes that to sustain this assignment it would be necessary for us to overrule Calicoat v. State, 131 Miss. 169, 95 So. 318; Adams v. State, 199 Miss. 163, 24 So. 2d 351; Lowry v. State, 202 Miss. 411, 32 So. 2d 197; Perry v. State, 44 So. 2d 393, and Bradford v. State, 161 So. 138, together with the many cases there cited, and perhaps others. This we are not willing to do. The rule is too well and too firmly embedded in our law.

 █ A reading of the facts as hereinbefore set forth manifests that the other assignment is not well taken. The case is therefore affirmed.

Affirmed.

*Lee, P. J., and Kyle, Ethridge and Rodgers, JJ.*, concur.