[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 990 
¶ 1. Joe Earnest Armstrong, Jr., John Bland, Kwame Brengettcy and Larry Carr were charged in a three-count indictment with conspiracy to commit a drive-by shooting, aggravated assault, and deliberate design murder. The trials of the four defendants were severed by the circuit court, and Armstrong and his three co-defendants were each tried separately for the crime of murder of Mark Martin. Armstrong was found guilty and sentenced to life imprisonment. Following the denial of his post-trial motions and being aggrieved of the conviction and sentence, he has appealed alleging that the trial court erred (1) in denying his motion to dismiss the indictment for violation of his rights to a speedy trial, (2) in allowing the testimony *Page 991 
of Detective Paul Shivers of the Batesville Police Department concerning an incident occurring the day after the charged murder, (3) in allowing hearsay statements of a co-defendant, (4) in allowing the introduction of the transcript of witness's testimony from the trial of a co-defendant, (5) in allowing the State to cross-examine a defense witness concerning threats the witness made to certain individuals, (6) in allowing the State to recall a rebuttal witness and allowing the rebuttal testimony of another witness, (7) in allowing the State's jury instructions concerning the elements of the crime of murder and the aiding and abetting instruction, and (8) in denying his peremptory instruction and separate motions for new trial and JNOV. Finding no reversible error, we affirm.
 FACTS
¶ 2. On the night of the incident in question Mark Martin was patronizing a local café known as Nick's Place in the town of Coffeeville, Yalobusha County, when a female asked him to dance with her. Martin at first declined, telling her that he wanted no trouble. Then, for whatever reason, Martin changed his mind and began dancing with her. As they were dancing, David Long, also known as Little David, made it known that he took offense to Martin and the young woman dancing together. Little David left the café but returned a short time later in the company of Armstrong, also known as Falfa, and co-indictees, Larry Carr, also known as Spanky, John Bland, also known as Junior or "J.R.," and Kwame Brengettcy.
¶ 3. Little David and his friends surrounded Martin and a loud argument ensued. The owner of the café intervened in the difficulty and sent them all outside. While outside, Carr, Bland, Brengettcy and Armstrong continued to confront Martin. There was testimony that Martin tried to avoid the confrontation. There was further testimony that Bland and Armstrong were engaged in a struggle with each other for possession of a pistol and that Armstrong cried out, "Let me kill that n----r!" The victim's brother, Calvin Martin, then appeared on the scene armed with a shotgun. The owner of the bar came outside and broke up the altercation, disarming Calvin Martin in the process.
¶ 4. Martin, the victim, decided to go to another night spot with a friend named Horton, and the two of them left Nick's Place on foot. Armstrong, Carr, Bland and Brengettcy also left Nick's Place. They departed in two separate vehicles, one of which was Armstrong's Oldsmobile. The foursome soon reappeared; however, this time they were all in Armstrong's vehicle. In the meantime, Martin and Horton were still attempting to walk to another night spot.
¶ 5. Milton Kimble was driving Martin's car alongside Martin and Horton as they were walking, urging Martin to get into the car. Armstrong's car approached Martin's car from the rear with its headlights turned off. As Martin walked toward the driver's side of his car, Armstrong's car pulled alongside Martin's car, and Bland called out, "What's up, n----r, now?" Martin ignored them and kept walking. Just as Martin made it to the rear door of his automobile, the occupants of Armstrong's car began shooting. Gunfire was seen coming from the front and rear passenger windows of Armstrong's car. Martin tried to run but was struck by gunfire and fell across the back of his car. He tried to get up, but the occupants of Armstrong's car continued to shoot him in the back.
¶ 6. The trial testimony was that Armstrong was in the driver's seat at the time of the shooting, and as soon as the shooting stopped he caused his car to "bounce" in an act of celebration. Armstrong then drove from the scene.
¶ 7. The chief of police of the town of Coffeeville, Jerry Martin (no relation to the murder victim), testified that he received a telephone call at about 11:15 on the night in question from Grenada Lake *Page 992 
Medical Center, reporting the admission of the victim in this case. Chief Martin instituted an investigation and immediately began looking for Armstrong and his companions. A "BOLO" (be on the look out) was issued for Armstrong and his car. At about 9:00 the next morning, the Batesville Police Department located Armstrong's car at a Batesville motel. Chief Martin drove to Batesville and met with deputies from the Panola and Yalobusha County Sheriff Departments and officers of the Batesville Police Department. Troopers from the Mississippi Highway Patrol also joined the contingent. They went to the motel parking lot and were able to positively identify an Oldsmobile parked there as the one belonging to Armstrong.
¶ 8. Detective Lieutenant Paul Shivers of the Batesville Police Department testified that he attempted to determine from the hotel clerk which rooms had been let to the occupants of the Oldsmobile. Not being entirely sure that the occupants of those rooms were the ones wanted in Coffeeville, he checked the telephone numbers to which calls had been placed during the night from the rooms. As a result of this effort, the officers were able to confirm that the rooms' occupants were the individuals being sought. However, at about that same time, an officer posted to keep watch of the Oldsmobile reported that the occupants of the rooms were leaving the motel. A contingent of Batesville police officers followed the Oldsmobile.
¶ 9. Lieutenant Raye Hawkins, also of the Batesville Police Department, was the officer assigned to pursue and stop Armstrong's car when it initially left the motel. Hawkins pulled behind Armstrong's car and activated his siren and lights. Armstrong neither stopped nor increased his speed, but continued to drive along at a speed of about 35 — 40 miles per hour, ignoring the lights and siren behind him.
¶ 10. Two roadblocks were set up, one by the Batesville police officers and one by the troopers. Armstrong drove his car through both roadblocks. As he did so, the officers fired shots at the car's tires, striking and deflating all four. Still, Armstrong drove on, and Hawkins continued behind him. At one point, Armstrong stopped. Hawkins also stopped and attempted to exit his patrol car; however, as Hawkins stepped from his patrol car, Armstrong drove off. All of Armstrong's tires were completely flat at this point.
¶ 11. Hawkins followed Armstrong's car and drew abreast of it. At this point, the chase was approaching a busy shopping area. Hawkins, seeing the need to put an end to Armstrong's refusal to stop, produced his shotgun and aimed it at the Armstrong car. Armstrong turned sharply to his right and crashed his vehicle to a stop.
¶ 12. After Armstrong and his passengers, Brengettcy, Carr, Bland and three females, were taken out of the car and subdued, a search of the area was made. A .38 caliber pistol with one live round was found in the road.
¶ 13. Dr. Steven Hayne performed an autopsy on the body of Mark Martin. He found four gunshot wounds: one to the right lower back, one to the left lower back, one to the left buttock, and one coursed across the chest. Either of the two bullet wounds to the lower back was mortal. Dr. Hayne removed one bullet fragment from the body during the course of the autopsy. Steve Byrd, a forensic scientist with the Mississippi Crime Laboratory specializing in firearms evidence examinations, testified that the bullet fragment removed from Martin's body and submitted to him for examination was fired from the pistol recovered from the area of Armstrong's crashed vehicle.
¶ 14. Jackie Spearman was called to testify by the State. Initially, he refused to answer questions, and at one point insisted that he be allowed to "plead the Fifth." Inasmuch as he was not, and never had been, accused in the matter of the killing of Martin, he was held in contempt for his refusal to answer and was sentenced to *Page 993 
spend the night in the county jail. The next morning Spearman was again brought in to testify. This time Spearman answered questions and testified that he knew Armstrong, Carr and Bland and saw them at a pool hall on the afternoon of the day of the shooting. He said that just as he was entering the pool hall he heard Armstrong and the other two discussing the victim. They were heard to say, "We're going to have to kill that n----r." They were also heard to say that the best time to accomplish this goal would be after the café closed that night. Spearman also heard Armstrong brag about having put a 12 gauge shotgun to Martin's head in the past. Spearman testified that he told Martin of this but that Martin did not appear to be concerned about it.
¶ 15. The defense opened with Kwame Brengettcy, who testified that Bland fired the shots from Armstrong's car that killed Martin. Brengettcy claimed that Bland did not share his intention beforehand and that there was no discussion among the riders in the car about hunting down and killing Martin. Brengettcy stated that after the killing of Martin, Armstrong and his company went to Charleston, found women, and went to the motel in Batesville.
¶ 16. Carr was called as a witness by the defense, and he also claimed that Bland committed the murder but that neither he nor Armstrong had any idea that Bland was going to kill Martin and that there were no discussions among them about killing Martin. Carr admitted that during Bland's trial Carr testified that Brengettcy killed Martin, but said that he testified to that at that time because he was afraid of Bland.
¶ 17. Armstrong took the stand in his own defense. His testimony was that gunfire erupted as he drove by Martin. He stated that he "punched" the gas and took off, thinking he had been fired upon. He said that it was not until he looked into the back seat that he discovered that Bland had a gun and had been firing it. Armstrong denied having fired any shots and denied having been a part of any plan to shoot Martin. Armstrong claimed that he drove through the roadblocks because he was being fired upon.
 ANALYSIS OF ISSUES PRESENTED I. The Violation of Armstrong's Statutory and Constitution Right to a Speedy Trial
¶ 18. By Armstrong's count, six hundred thirty days elapsed from the date of the incident to the jury trial; therefore, he claims that his constitutional right to a speedy trial by jury was violated. He further claims that from the date of his waiver of arraignment until his trial four hundred thirty-eight days elapsed. This, according to him, violated his statutory right to be tried within two hundred seventy days.
¶ 19. In Barker v. Wingo, 407 U.S. 514 (1972), the United States Supreme Court provided the standard to review a claimed denial of the constitutional right to a speedy trial. Four factors must be considered: (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his right, and (4) whether the defendant was prejudiced by the delay. Id. at 530-32.
 (1) The Length of the Delay
¶ 20. The constitutional right to a speedy trial attaches at the time a person is arrested. Smith v. State, 550 So.2d 406, 408 (Miss. 1989). A delay of at least eight months is presumptively prejudicial. Jaco v. State, 574 So.2d 625, 630 (Miss. 1990). Twenty months elapsed from the time of Armstrong's arrest until his trial. We presume prejudice.
¶ 21. In Flores v. State, 574 So.2d 1314, 1322 (Miss. 1990), the Mississippi Supreme Court held that if an extensive delay exists prior to trial, then that delay "must be weighed heavily in favor of [the *Page 994 
defendant] in the balancing test." Id. "However, the delay should not [be] conclusively weighted against the State," because the presumption of a prejudicial delay may be rebutted when balanced by the remaining factors. Herring v. State, 691 So.2d 948, 955 (Miss. 1997) (citing Wiley v. State, 582 So.2d 1008, 1012 (Miss. 1991)). Having found that the length of the delay in this case is such that prejudice can be presumed, we must now look to the reasons for the delay to determine whether that presumption is effectively rebutted.
 (2) The Reason for the Delay
¶ 22. Armstrong contends that, even though the State and lower court blamed the crowded court docket as the reason for the delay, that explanation does not fully explain the delay. Consequently, he concludes that this factor must also weigh against the State. By the State's calculation, 627 days elapsed from the date of the arrest to the date of trial, and the number of days expiring between the date of arraignment and trial was 438 days. The State argues that trial was originally set for August 17, 1998, and the trial did not take place on that date because Armstrong and his co-defendants requested and were granted a severance. The State contends that Armstrong and his co-defendants moved for this relief on July 31, 1998, and had the trial occurred as originally set, the time frames would be: (1) between arrest and trial — 347 days, and (2) between waiver of arraignment and trial — 158 days.
¶ 23. The Mississippi Supreme Court has held that once the delay is found to be presumptively prejudicial, "the burden shifts to the prosecutor to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of the reasons."State v. Ferguson, 576 So.2d 1252, 1254 (Miss. 1991). The State contends that it was the motion to sever, joined in by all the defendants, that resulted in the delay in Armstrong's trial. The State further contends that Miss. Code Ann. § 99-17-1 (Rev. 2000) provides that a criminal defendant must be tried within 270 days of his arraignment unless "good cause be shown" and that there would be no issue here at all with respect to the 270-day rule had the trial occurred as originally set, inasmuch as only 158 days intervened between the decision to waive arraignment and the original date of trial.
¶ 24. The State goes on to explain that once the motion to sever was granted the State was obliged to conduct as many trials as there were defendants in this case. On the day set down in the August 1998 term of court for the trial of all defendants, the State tried "Junior" Bland. There was no other term of court until March of the following year. During that term another co-defendant from whom Armstrong was severed, Kwame Brengettcy, was tried. Armstrong received his day in court as soon thereafter as was practically possible when the circuit court, on February 5, 1999, set a special term for Armstrong, instructing the clerk of the court to find time for it.
¶ 25. The State argues, and the trial court found, that one of the primary reasons for the delay was Armstrong's and his co-defendants' motion to sever. This, argues the State, was a delay of Armstrong's own making and is not one that he can now complain about. The State alleges that the other reasons for the delay have to do with the fact that the Coffeeville District of Yalobusha County has only two terms of court a year. Aside from the necessity of having to schedule and conduct four separate trials for each of the defendants, there were other cases on the docket.
¶ 26. On the morning of the trial Armstrong made an oral motion for dismissal for violation of his rights to a speedy trial and for violation of § 99-17-1. The trial court found as follows:
 THE COURT: I don't find any speedy trial violation or a 270 Day. I'll kind of rule together. These — there were four people charged in this murder and this is the third defendant to go to trial. *Page 995 
 Armstrong moved and was granted a severance. I tried a — the Bland case which was a return on the indictment on the first setting. I tried the Brengettcy case the next term. This is a special setting for this case.
 Armstrong hasn't shown that the State had any plan to defer these trials. They are coming as orderly as I know how to bring them forward. It hasn't been shown that the State gained any type of undue advantage or any leverage on the Defendant. The Defendant hasn't shown any prejudice. The Defendant — this is a — this case has already been set for trial for today before the Defendant filed his speedy trial motion. We had this special made in, I think — this special setting was made — I'm not sure about that statement, but the so-called motion for speedy trial was filed December 21, 1998. I'm not exactly sure when the order was entered setting this case for trial today. I ordered a special term of court last summer and told the Court Administrator to find time to set the Armstrong case.
 It's just been a total lack of showing on the part of Armstrong of violating any rights. He can't ask for a severance and get it and then complain about somebody getting tried before he got tried, and that's essentially what he's doing. So, it's overruled.
¶ 27. The State, citing Baine v. State, 604 So.2d 258 (Miss. 1992), argues that these facts amount to good cause for the delay in bringing Armstrong to trial. This Court agrees and finds that this factor weighs in favor of the State.
 (3) Whether the Defendant Asserted His Right to a Speedy Trial
¶ 28. An accused certainly is under no duty to cause his own trial. However, one of the four Barker factors will weigh in his favor if in fact he has asserted his right to a speedy trial and put the court on notice of his demand. Perry v. State, 637 So.2d 871, 875 (Miss. 1994).
¶ 29. Armstrong argues that he asserted his right to a speedy trial and that factor favors him. The record reveals that on December 21, 1998, Armstrong filed a pro se motion for dismissal, alleging a violation of his Sixth Amendment right to a speedy trial. On the day of his trial Armstrong's counsel made an oral motion to dismiss the indictment for a violation of Armstrong's right to a speedy trial by jury, and in the alternative, for violation of the 270-day requirement contained in § 99-17-1.
¶ 30. Neither the December 21, 1998 pro se motion nor the oral motion made by Armstrong's counsel on the day of trial was an assertion or demand for a speedy trial; rather, both motions were demands for dismissal for violation of his right to a speedy trial. The Mississippi Supreme Court has previously acknowledged the distinct difference between a demand for a speedy trial and a demand for dismissal for a speedy trial violation. "A demand for dismissal for violation of the right to speedy trial is not the equivalent of a demand for a speedy trial. Such a motion seeks discharge not trial." Perry v. State, 637 So.2d 871, 875 (Miss. 1994); see Adams v. State, 583 So.2d 165, 170 (Miss. 1991). We weigh this factor against Armstrong.
 (4) Whether the Defendant Was Prejudiced by the Delay
¶ 31. We now turn our attention to the matter of actual prejudice, if any, caused by the delay. In doing so we examine the issue from two different perspectives. First, there is a possibility of prejudice arising from the delay itself, including lost witnesses and evidence, dimmed memories, and other similar complications that affect the reliability of the fact-finding. Skaggs v. State,676 So.2d 897, 901 (Miss. 1996). Second, the defendant may suffer because of the restraints to his liberty. "[W]holly aside from possible prejudice to a defense on the merits, [delay] may `seriously interfere with the *Page 996 
defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.'" Atterberryv. State, 667 So.2d 622, 627 (Miss. 1995) (quotingMoore v. Arizona, 414 U.S. 25, 26-27 (1973)). That having been said, the Mississippi Supreme Court has, nevertheless, held that "[i]ncarceration alone is not enough prejudice to warrant reversal." Taylor v. State, 672 So.2d 1246, 1261 (Miss. 1996).
¶ 32. Although Armstrong was incarcerated for the 630 days (by his count) leading up to his trial, he alleges no actual harm to his defense. He merely states categorically that he was prejudiced by the delay, by being incarcerated, by worry, anxiety and unrest. "[I]f the defendant fails to make a showing of actual prejudice to his defense, this prong of the balancing test cannot weigh heavily in his favor." Polk v. State, 612 So.2d 381, 387 (Miss. 1992).
¶ 33. Reviewing Armstrong's assertions of prejudice, we are left with only the presumptive prejudice surrounding the length of the delay. He has failed to show any prejudice other than the length of his pretrial incarceration. Having reviewed all of the Barker
factors in their entirety and after reviewing the totality of the circumstances in this case, we conclude that this delay resulted in no actual prejudice to Armstrong.
 II. Testimony of Detective Paul Shivers
¶ 34. Armstrong filed a pretrial motion in limine to limit and restrict the testimony of Paul Shivers of the Batesville Police Department concerning the low-speed car chase that took place the day after the shooting. Armstrong moved to limit the evidence as being remote in time to the shooting. The motion in limine was denied by the circuit court judge who found as follows:
 [T]he Court finds that the prior criminal conduct of the Defendant prior to the time of the indictment on the charges of Conspiracy, Aggravated Assault and Murder, and the times preceding the charges in the indictment, more specifically, the Defendant's actions in Panola County, Mississippi in an attempt to avoid arrest; the Court will allow the State of Mississippi, through the office of the District Attorney, to tie these incidents into the charges in the indictment, under the totality of circumstances exceptions; and if the District Attorney can show relevancy, these actions will be admissible at trial; therefore, the Motion in Limine is overruled as to the prior and post activities of the Defendant, Joe Earnest Armstrong, Jr.
¶ 35. Shivers was allowed to testify concerning events concerning Armstrong's actions immediately preceding his arrest. He testified that Armstrong failed and refused to stop his vehicle in response to Shivers's patrol car's lights and siren, drove through two roadblocks, kept driving even when all four of his tires were flattened and only stopped when threatened with a shotgun.
¶ 36. The standard of review regarding the trial court's admission of evidence is well settled. The admissibility of evidence rests within the discretion of the trial court. However, the trial court's discretion must be exercised within the scope of the Mississippi Rules of Evidence, and reversal will be appropriate only when an abuse of discretion resulting in prejudice to the accused occurs. Sturdivant v. State, 745 So.2d 240 (¶ 10) (Miss. 1999) (other citations omitted).
¶ 37. Armstrong argues that Mississippi Rules of Evidence 403 provides that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative *Page 997 
evidence, and further that evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. Therefore, Armstrong concludes, in order to pass muster under the evidentiary rule governing other "bad acts" evidence, the evidence must be such that it satisfies some other evidentiary purpose beyond simply showing that the defendant is the sort of person likely to commit the crime charged. Finally, Armstrong argues, if evidence is allowed under such rule, it must still satisfy the rule providing for exclusion of evidence on grounds of prejudice, confusion or waste of time, which is the ultimate filter through which all otherwise admissible evidence must pass.
¶ 38. The State points us to Jimpson v. State, 532 So.2d 985, 990 (Miss. 1988), where the Mississippi Supreme Court, citing Professor Wigmore, observed that: "It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."
¶ 39. We find that Shivers's testimony was evidence of flight and is of the kind that is admissible under M.R.E. 404(b) as proof of consciousness of guilt. The one exception to admissibility appears to be in situations in which the fleeing felon is wanted for more than one offense, such as, for example, escape and murder. Mack v.State, 650 So.2d 1289, 1310 (Miss. 1994). This exception is not present in the case at bar and is not urged upon the Court by Armstrong.
¶ 40. We likewise find that the evidence of Armstrong's flight was not remote. A "BOLO" had been issued for Armstrong shortly after the shooting. He was located some twelve hours later, and when law enforcement agents attempted to arrest him, he attempted to avoid arrest by refusing to stop his automobile. When he was finally stopped, the gun used to kill Martin was found on the highway near his car. This is all closely connected with the crime itself and thus is not remote. Thus, it was not an abuse of discretion by the trial court to admit the testimony.
 III. The Testimony of Jackie Spearman, the Prior Trial Impeachment Testimony of Jackie Spearman and the Cross-Examine Kwame Brengettcy
¶ 41. These three issues have been combined for purposes of analysis because in each instance Armstrong claims error on the part of the trial court, yet in each instance he has done little more than set forth the objectionable testimony and make a conclusory allegation that the testimony was highly prejudicial to him. He has cited no authority to support his conclusory assertions, those being: (a) that Spearman was improperly allowed to testify to statements made by Larry Carr, a co-indictee, regarding the co-indictees' intention to kill Martin when the club closed for the night, (b) that it was improper to allow Spearman to be impeached via the testimony Spearman gave in co-indictee Bland's trial and (c) that it was improper to allow the State to cross-examine Brengettcy concerning threats Brengettcy and Armstrong allegedly made to Jackie Spearman and Patrick Spearman.
¶ 42. As to the cross-examination of Brengettcy, the record reveals that the court sustained Armstrong's objection to the State's lines of questioning. After the objection was sustained, Armstrong did not ask that the jury be directed to disregard the questions. In light of the fact that the trial court sustained the objection and Armstrong did not request any further action of the court, we conclude that there is no merit to this contention.
¶ 43. The trial court allowed the transcript of Jackie Spearman's testimony from Bland's trial when Spearman refused to testify. We agree with the State that when Spearman emphatically told the court that he was not going to testify, he *Page 998 
became unavailable as a witness within the meaning of M.R.E. 804(b). It was at this point that the transcript of his sworn testimony in Bland's trial was admitted. The defense objected that there may be some portions of the transcript that would be inadmissible in Armstrong's trial. The trial judge agreed and promised to check on that matter. Nevertheless, he allowed the transcript to be admitted. The record is silent as to whether the trial court ever redacted any portions of the transcript. It is likewise silent as to whether that particular point was ever brought back to the attention of the trial judge by defense counsel.
¶ 44. For refusing to testify, Spearman was held in contempt of court and incarcerated in jail overnight. The night in jail apparently had a sobering effect on Spearman because the next day, he came into court and testified, although reluctantly. Armstrong did not request at that time that the previously admitted transcript of Spearman's testimony be withdrawn.
¶ 45. Spearman testified to statements that he heard co-indictee Larry Carr make concerning the intentions of the co-indictees, including Armstrong, of killing Martin when the club closed. Armstrong contends the statements were hearsay inasmuch as they were allegedly made by Larry Carr but testified to in court by Spearman. Apparently Armstrong has forgotten that Spearman also testified that "Falfa (Armstrong's nickname) and J.R. agreed and all of them said, `Yeah, we can get him (Martin) when the club closes.'" When Spearman was asked who was the "they," he stated that the "they" was Armstrong, Bland and Brengettcy.
¶ 46. Carr was charged by indictment, along with Armstrong and others, with the same murder for which Armstrong was being tried. The murder count of the indictment, however, did not charge Armstrong, Bland, Brengettcy and Carr with conspiracy to commit murder, nor did it charge them with aiding and abetting each other in the commission of the murder. However, Spearman's testimony concerning Armstrong's specific involvement in the plot to get Martin, along with his comments, was admissible against Armstrong. While it was not relevant what the other co-defendants did or said, we do not find admission of that evidence prejudicial to Armstrong in light of evidence of his specific involvement.
 IV. The Rebuttal Testimony of Fred Lee Hart
¶ 47. The State was allowed to introduce the testimony of Fred Lee Hart who was an eyewitness to certain incidents. As such, Armstrong contends that Hart should have been called during the State's case-in-chief and that it was improper for Hart to testify as a rebuttal witness. When the State called Hart, Armstrong's counsel made the following objection:
 Mr. Vanderburg: Objection. Wait a minute. Objection. Your Honor, I don't know what he's fixing to testify to but I think this is improper rebuttal at this time. I think he was an eye witness. I don't think the State's allowed to put an eyewitness on during rebuttal. I think the rules are that this man has evidence that was admissible in the State's case in chief, that they're supposed to bring it out and not wait until the end.
The court moved the proceedings to chambers where the following took place:
 MR. HORAN [For the State]: Your Honor, we had no way of knowing what the Defendant was going to say, admit or deny.
 THE COURT: Well, tell me what it's in rebuttal to, what witness, what testimony. That's what rebuttal's for, is to rebut something that was brought out on cross.
 MR. HORAN: He denied seeing any gun, if I recall right, at Fred Lee Hart's house. We expect Fred Lee Hart to testify that John — J.R. got a shotgun at *Page 999 
that particular time and he was there. And I believe he denied that on his direct examination.
 Another point that we were going — he vehemently denied having a pistol at the night club that night but that J. R. had the pistol and I believe Mr. Hart's going to testify that he saw him with that pistol.
 THE COURT: That's rebuttal.
 MR. HORAN: Yes, sir.
 THE COURT: Now, what was your objection? Your objection was about any eyewitness or something. Go ahead.
 MR. VANDERBURG: They're trying to put on an eyewitness to their case — the whole theory of the case is that this man had a gun. Now, he was a witness at Nick's Place when the argument started. I mean, this guy is a — should have been brought on in the State's case in chief. He was a material witness to the argument that happened at Nick's Place between the Defendants and Mark Martin, and he's also a witness out at his own house where the — where this Armstrong and Kwame and Bland and Carr all met. This is evidence I feel that should have been brought on in the State's case in chief. When the man's a material witness, they intentionally left him off to put him simply on rebuttal when they should have brought him out in the State's case in chief.
 THE COURT: I can't rule that. I mean, based on what was just related to me that he is going to be put on to rebut testimony that was brought out in the defense's case in chief through the Defendant himself. It seems proper and it seems to me like what rebuttal witnesses are for. I understand you can't sandbag and hold back witnesses that are obviously case in chief witnesses, but this Defendant has denied that he had a gun there, denied that another gun was involved, and specifically that any gun was gotten out at Fred Hart's house. So, this would be rebuttal testimony.
 THE COURT: I don't think the State can anticipate all the denial that's going to be made by the accused. I think they have the right to come back and rebut that. I will overrule that objection.
¶ 48. The determination of whether evidence is properly admitted as rebuttal evidence is within the trial court's discretion.Wakefield v. Puckett, 584 So.2d 1266, 1268 (Miss. 1991). Therefore, on appeal, we review such a ruling only for an abuse of discretion. McGaughy v. State, 742 So.2d 1091, 1093 (Miss. 1999). Generally, the party bearing the burden of proof must offer all substantive evidence in its case-in-chief. Hosford v. State,525 So.2d 789, 791 (Miss. 1988); Roney v. State, 167 Miss. 827, 830, 150 So. 774, 775 (1933). Where, however, there is doubt as to whether the evidence is properly case-in-chief or rebuttal evidence, the court should resolve the doubt in favor of reception in rebuttal if: (1) "its reception will not consume so much additional time as to give an undue weight in practical probative force to the evidence so received in rebuttal, and (2) the opposite party would be substantially as well prepared to meet it by surrebuttal" as if the testimony had been offered in chief, and (3) the opposite party upon request therefor is given the opportunity to reply by surrebuttal. Smith v. State,646 So.2d 538, 543-44 (Miss. 1994) (quoting Riley v. State, 248 Miss. 177, 186, 157 So.2d 381, 385 (1963)). However, in cases where there is no doubt that the testimony should have been offered in the case-in-chief, allowing the testimony into evidence in rebuttal is reversible error. Hosford, 525 So.2d at 791-92.
¶ 49. Armstrong contends that this was a situation in which there was no doubt that the testimony should have been offered in the State's case-in-chief and that allowing it to be admitted in rebuttal constituted reversible error. However, after having said so, he makes no argument and offers no proof of the assertion. The trial court, on the other hand, was clear in its reasoning for finding that the testimony was proper *Page 1000 
rebuttal, and we can find no fault with that decision or any abuse of discretion.
 V. The Jury Instructions
¶ 50. Armstrong claims that instruction 9-a is "misleading and conflicting." More specifically, he alleges that the instruction permitted the jury to find him guilty of murder if he committed only one element of the crime without a finding that a murder was in fact committed. Armstrong also asserts that instruction 9-a is flawed in the same manner as the instruction that was condemned inBerry v. State, 728 So.2d 568 (Miss. 1999). Instruction 9-a reads as follows:
 Members of the Jury, the Defendant, JOE ARMSTRONG A/K/A FALFA, has been charged with the crime of Murder along with JOHN BLAND, JR., A/K/A "J.R.", KWAME KENYATTA BRENGETTCY, A/K/A "MAC TEN" AND LARRY CARR, JR., A/K/A "SPANKY." As you know, each Defendant will be tried separately, and only JOE ARMSTRONG A/K/A FALFA, is on trial today for this crime.
 The Court instructs the Jury that Murder is the killing of a human being with malice aforethought, not in necessary self-defense, without the authority of law, by any means or by any manner, when done with the premeditated and deliberate design to effect the death of the person killed.
 The Court further instructs the jury that if you believe from the evidence in this case, beyond a reasonable doubt, that from the evidence presented during this trial that someone other than JOE ARMSTRONG A/K/A FALFA actually pulled the trigger and shot and killed Mark Martin, but that more than one person is responsible for the death of Mark Martin, you may still find the Defendant JOE ARMSTRONG A/K/A FALFA, guilty of Murder.
 Accordingly, the Court instructs you the Jury that each person present at the time, and consenting to and encouraging the commission of a criminal offense, including murder, and knowingly, willfully, and feloniously doing any act which is an element of the crime, or immediately connected with it, or leading to its commission, is as much a principal offender as if he had with his own hand pulled the trigger and committed the whole offense. Therefore, if you are unable to find beyond a reasonable doubt that JOE ARMSTRONG A/K/A FALFA, actually shot with a firearm and killed Mark Martin, But, YOU THE JURY DO FIND from the evidence beyond a reasonable doubt that:
 1) The Victim, Mark Martin, was a living person on September 1, 1997, in Coffeville, MS and,
 2) Someone other than the Defendant, JOE ARMSTRONG A/K/A FALFA, did willfully and with malice aforethought, shoot with a firearm and kill Mark Martin, with the deliberate design to effect the death of Mark Martin, and;
 3) The Defendant, JOE ARMSTRONG A/K/A FALFA, was present at the time of the murder of Mark Martin, and consented to and encouraged the commission of the crime of the Murder of Mark Martin, and did knowingly, willfully, unlawfully and feloniously do any act which is an element of the crime of murder, or leading to its commission, such as, if you the jury so find, but not necessarily limited to, knowingly, willfully, unlawfully and feloniously driving the actual shooter into position to shoot and kill Mark Martin, then you shall find the Defendant, JOE ARMSTRONG A/K/A FALFA, GUILTY OF THE CRIME OF MURDER OF MARK MARTIN
 If the State has failed to prove any one or more of these elements, beyond a reasonable doubt, then the jury shall find JOE ARMSTRONG A/K/A FALFA, not guilty of murder.
The instruction in Berry reads as follows:
 The Court instructs the jury that each person present at the time, and consenting *Page 1001 
to and encouraging the commission of a crime, and knowingly, willfully and feloniously doing any act which is an element of the crime, or immediately connected with it, or leading to its commission, is a principal.
 One who aids, assists and encourages a transfer of cocaine is a principal and not an accessory, and his guilt in nowise depends upon the guilt or innocence, the conviction or acquittal of any other alleged participant in the crime. Therefore if you believe from the evidence, beyond a reasonable doubt, that Merlinda Berry did willfully, unlawfully and feloniously do any act which is an element of the crime of transfer of cocaine, as defined by the Court's instructions, or immediately connected with it, or leading to its commission, then and in that event, you should find Merlinda Berry guilty of transfer of cocaine as charged in the indictment.
Berry, 728 So.2d at 570.
¶ 51. In Berry the court found that the granting of this instruction (S-3) amounted to plain error because the jury was not fully instructed on the elements of the crime. The court found that while there were instructions other than S-3 which properly instructed the jury on the elements of transfer of cocaine and on the State's burden of proof, the problem with S-3 was that it appeared to give the jury an additional option of finding the defendant guilty if she committed only one element of the crime, without even finding that the crime was ever completed. Id. The court further found that even if the jury read all of the instructions together, they could still be misled into believing that instruction S-3 was merely another option in addition to the choice of finding that Berry committed all of the elements of the crime herself. The court concluded that the instruction was confusing and misleading, and therefore required reversal. Id.
¶ 52. This was not the situation that existed with regard to instruction 9-a at Armstrong's trial. Instruction 9-a clearly met the criterion that were lacking in Berry. It properly instructed the jury on the elements of murder and on the State's burden of proof, and unlike the instruction in Berry, 9-a did not give the jury the additional option of finding Armstrong guilty if he committed only one element of the crime without first finding that the crime was completed.
¶ 53. Finally, Arm strong alleges error in the denials of his peremptory instruction, motion for new trial and JNOV. However, he argues only the sufficiency of the evidence; consequently, we will only address that aspect of this issue. Armstrong contends that the evidence was insufficient to prove beyond a reasonable doubt that he aided and abetted the killing of Mark Martin and that his mere presence was not enough to convict.
¶ 54. When reviewing a challenge to the sufficiency of the evidence, all of the evidence must be considered in the light most consistent with the verdict, giving the State the benefit of all inferences favorable to the verdict. The verdict will be affirmed when the evidence is such that reasonable jurors could have found the defendant guilty. Dudley v. State, 719 So.2d 180, 182 (Miss. 1998). We have considered all of the evidence presented in this case in the light most consistent with the verdict, and after giving the State the benefit of all inferences favorable to the verdict, we are left with the firm conviction that a reasonable jury could have found Armstrong guilty. Accordingly, this assignment of error is without merit.
¶ 55. THE JUDGMENT OF THE CIRCUIT COURT OF YALOBUSHA COUNTY OFCONVICTION OF MURDER AND SENTENCE TO A TERM OF LIFE IMPRISONMENTIN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. THECOSTS OF THIS APPEAL ARE ASSESSED TO YALOBUSHA COUNTY. *Page 1002 
McMILLIN, C.J., KING AND SOUTHWICK, P. JJ., BRIDGES, LEE,MOORE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR.