COLEMAN, Justice,
for the Court:
¶ 1. Carla Darnell (“Carla”) and William Duff Darnell (“Duff’) were married in 2004 and divorced by judgment of the Chancery Court of Jefferson Davis County on August 6, 2012. The couple had one child, a son, C.D., in 2006. While the divorce was pending, C.D. exhibited behaviors which may have suggested sexual abuse. Duff denied any abuse, and investigations by the Department of Human Services did not substantiate abuse. No charges were filed against Duff. Carla sought a temporary protective order and consulted with a child-abuse expert who determined that C.D. exhibited behaviors that were indicative of abuse. Carla sought sole physical custody of C.D. Instead, the chancellor granted physical custody of C.D. to Duff, stating that Carla had been the one pursuing the child-abuse allegations when it was clear that none had occurred and that the Albright factors weighed in favor of Duff. Carla appealed. The Court reverses the chancellor’s decision and remands for new findings of fact and conclusions of law which take into account some of C.D.’s statements, which were not admitted at trial.

FACTS AND PROCEDURAL HISTORY

¶2. Carla and Duff were married on November 20, 2004, in Antigua, West Indies. The couple had a son, C.D., born July 12, 2006. They lived together in Prentiss, Mississippi, until September 2010, when they separated and Duff moved out of the marital home. Duff was in the military, and had been deployed for a year from March 2009 to March 2010. Though not divorced, the two remained separated, and even set up a visitation schedule for Duff to be with C.D. at his home in the Hattiesburg area. Duff reported to the guardian ad litem that Carla became “increasingly controlling of the pattern and timing of visitation.” Carla said that she was afraid that Duff would not return C.D. after visitation because of the tensions between the two. Although the two tried to work on the marriage, it seemed a divorce was inevitable.
¶ 3. In February 2011, Carla filed for a divorce on grounds of habitual cruel and inhuman treatment, or, in the alternative, irreconcilable differences. Carla sought “full legal and physical custody” of C.D., with “regular visitation” for Duff. Duff denied the allegations of cruel and inhuman treatment, and the divorce proceeded apace. In late March 2011, two separate incidents involving C.D. at his daycare impacted the divorce proceeding. On March 25, 2011, Maehelle Dyess, the director of the Prentiss Baptist Daycare, observed C.D. with his hands between the legs of a girl who was sitting next to him. When Dyess asked C.D. what he was doing, he told her that he was “just tickling.”[1] Dyess testified that C.D. was always very touchy with the other children and often got into trouble. Dyess did not then report that behavior to C.D.’s parents.
¶4. The following Monday, March 28, 2011, C.D.’s teacher, Dana Walker, overheard him tell a little girl, “I’m going to *199 eat your privates.”[2] When Walker heard the statement, she and Dyess took C.D. to Dyess’s office and asked him to explain what he had said. C.D. told her, “That’s the way me and my daddy play.” Dyess admitted that, from the context of the sentence, she couldn’t tell whether C.D. meant that his father had told him about eating privates, or whether he and his father had tickled each other. Dyess called Carla and had her come to the school, where Dyess informed Carla what C.D. had said, and also that he had touched another girl on the previous Friday. Dyess informed Carla that she had to write a report and notify the Department of Human Services.
¶ 5. Independently, Carla contacted her counselor, Ruth Glaze, who referred Carla to her husband, Henry Glaze, an officer in the Juvenile Division of the Hinds County Sheriffs Department. He told Carla to contact law-enforcement authorities, and that the Department of Human Services would become involved because the daycare would report the incident. Tierra Oatis, a family-protection worker for the Department of Human Services, contacted Carla. Oatis met with C.D. in Carla’s home on March 29, 2011. Oatis reported that C.D. had told her that his father had hurt his “pee-pee.” When Oatis asked C.D. what his dad did to him he did not respond. C.D. also said that his mother never abused him, and that there was nothing that he wanted to tell Oatis.
¶ 6. Oatis scheduled a forensic interview with C.D. at the Child Advocacy Center in Hattiesburg, on April 11, 2011. Child Advocacy Center employee Cheryl Caldwell conducted the interview while Oatis watched and listened through a window. During the interview, C.D. often proved unresponsive and stated, “I don’t know,” to many of the questions. C.D. stated that his father did touch him, but when asked if anyone told him to say that, he ran out of the interview room, and the interview concluded. The Department of Human Services report filed by Oatis concluded that “there [was] no evidence to suggest that any sexual abuse ha[d] occurred at th[at] time.” However, the report did note that there were “reasons to believe that sexual abuse/exploitation is suspected.... ” The agency referred the child to counseling services so that, if any information regarding abuse came to light, the child already would be receiving treatment. Finally, the agency notified Duff that he could resume visitation with C.D. The next day, Carla recorded in writing an alleged occurrence in which C.D. told her that his father “spanks [C.D.’s] pee pee,” and pleasured himself at the same time. She then brought C.D. to see Dr. Scott Benton, a pediatrician specializing in child sexual abuse on April 14, 2011, three days after the Department of Human Services concluded that there was no evidence of sexual abuse.
¶ 7. Carla told Dr. Benton about the allegations of abuse. She also told Dr. Benton that, one night in August 2010, she and Duff were sleeping in the bed -with C.D. between them when she witnessed Duff masturbating. She told Dr. Benton that Duffs superior officer, Captain Gary Kinsey, told her that Duff admitted to masturbating while in bed with C.D.; Kinsey denied making such statements. She also told him about the incidents at C.D.’s daycare, as well as C.D.’s story about Duff “spanking his pee pee.” Dr. Benton at *200 tempted to interview C.D. but said he was “easily distracted and strong willed” and that he was unresponsive to several questions. Dr. Benton found that the history relayed by Carla “was suggestive for sexual abuse of C.D. by his father,” and recommended that C.D. be placed in protective placement away from Duff during the investigation of the allegations.
¶ 8. On April 27, 2011, Carla obtained a no-contact order from the Youth Court of Jefferson Davis County. The judge ordered no contact between C.D. and his father until the investigation by the Department of Human Services and the Prentiss -Police Department concluded. The court apparently relied upon the findings of Dr. Benton and Carla’s recollection of events. Duff did not participate in the youth-court proceedings.
¶ 9. In May 2011, the chancellor ordered that a guardian ad litem be appointed. On June 6, 2011, Chancellor David Shoemake granted temporary relief, giving Carla and Duff joint legal custody, with primary physical custody to Carla. Duff was given visitation every other week during the summer of 2011. The guardian ad litem submitted her report on September 6, 2011. She extensively observed C.D. with both of his parents during the summer. The guardian ad litem did not observe any strange behavior between C.D. and Duff, and concluded that there “were no CLEAR signs of abuse,” although there were indications, given C.D.’s comments and behavior at daycare. She stated that “there was absolutely nothing that would lead me to believe that this child was not thoroughly enjoying the visit with his father during the time of my observation.” The guardian ad litem recommended that custody should not be determined until both parties agreed to find out why C.D. said and did the things that he did.
¶ 10. The chancellor held a hearing on Carla’s petition for divorce and custody and Duffs counterclaim for custody on November 3, 2011. The hearing recessed and then continued on March 1, 2012. On November 3, 2011, the guardian ad litem submitted a supplemental report. The guardian ad litem conducted an Albright[3] analysis to determine what outcome would best serve the interests of the child and found that neither parent was favored. The guardian ad litem recommended that the parents share joint legal and physical custody of C.D., with Carla having him during the school year and Duff during the summer. At the November 2011 hearing, the chancellor refused to admit any of C.D.’s statements, deeming them inadmissible hearsay not meeting the requirements of the tender years exception.[4] He also refused to allow Dr. Benton to testify, because his conclusions were based upon Carla’s recitation of the events, C.D.’s statements at daycare, and C.D.’s interviews with the Department of Human Services and Child Advocacy Center. The chancellor found that any opinion Dr. Benton could render in regard to C.D. would be “unsupported speculation” and inadmissible. After a recess, the parties entered an agreed motion for an irreconcilable differences divorce, with Carla withdrawing her plea for a fault-based divorce. Although Duffs attorney asked the chancellor to address visitation for only Thanksgiving and Christmas until a final ruling on custody could be made, the chancellor changed the temporary custody order and awarded custody to each parent for alternating two-week periods.
*201 ¶ 11. The chancellor held a final hearing on March 1, 2012. Prior to the final hearing, the guardian ad litem submitted an updated report to the effect that the two-week alternating custody was not in C.D.’s best interest, and that a different custody arrangement needed to be made. At the hearing, Duff called several witnesses in support of his counterclaim. Ultimately, the chancellor conducted his own Albright analysis and issued a final ruling on divorce and custody on August 6, 2012. The chancellor granted the divorce based on irreconcilable differences and found that the Albright factors weighed in Duffs favor, granting him primary physical custody of C.D. during the school year, with visitation for Carla on alternating weekends. He gave physical custody of C.D. to Carla for the summer, with visitation for Duff on alternating weekends.
. ¶ 12. Carla filed a Motion for New Trial, Reconsideration and for Relief from Judgment, which the chancellor denied. Carla timely perfected her appeal, asserting the following errors:
1. The statements given by C.D. should have been admitted, as they were not hearsay, or, alternatively, they should have been admitted under the tender years hearsay exception defined in Mississippi Rule of Evidence 803(25).
2. The chancellor erred in forbidding the testimony of Dr. Benton and applied the incorrect “beyond a reasonable doubt” standard in making his rulings.
3. The chancellor failed to state why he did not follow the guardian ad li-tem’s recommendations, and failure to do so is reversible error.
4. The chancellor’s holding was contrary to the overwhelming weight of the evidence.

STANDARD OF REVIEW

¶ 13. “When this Court reviews domestic relations matters, our scope of review is limited by the substantial evidence/manifest error rule. Therefore, we will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.” Giannaris v. Giannaris, 960 So.2d 462, 467 (¶ 8) (Miss.2007) (citations and quotations omitted). "When reviewing questions of law, the standard of review is de novo. McNeil v. Hester, 753 So.2d 1057, 1063 (Miss.2000). “Our well-settled standard of review for the admission or suppression of evidence is abuse of discretion.” Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (¶ 4) (Miss.2003).

ANALYSIS

1. Whether the statements given by C.D. should have been admitted, as they were not hearsay, or, alternatively, they should have been admitted under the tender years hearsay exception defined in Mississippi Rule of Evidence 803(25).
¶ 14. Carla’s counsel proffered the testimony of several witnesses who heard statements made by C.D. that his father had potentially abused him. Dyess, the head of C.D.’s daycare, testified that when she had asked him what he was doing when his hands were touching another girl in the genital area, he replied that he was “just tickling.” Duff objected, and the objection was sustained. Dyess also testified that C.D. told her that he had told the same girl that he would “eat her privates,” and that was the way that he and his daddy “play.” Duff again objected, and the court once again sustained. Dana Walker, C.D.’s teacher, testified about the same statements during a proffer, but the statements were ruled inadmissible hear *202 say. The video of C.D.’s Child Advocacy Center interview also was excluded as inadmissible hearsay.
¶ 15. At trial, Carla proffered the statements after objection from counsel for Duff. She argued that the testimony was hearsay, but that it should be permitted under the tender years exception provided by Rule 803(25) of the Mississippi Rules of Evidence. On appeal, she argues that the testimony either was: (1) not hearsay, or (2) that it should have been admitted under the tender years exception. Duff responds that the chancellor was correct in his ruling on hearsay and the lack of an applicable hearsay exception, but he does not specifically address the argument that C.D.’s statements were nonhearsay.
¶ 16. The first two statements that Carla sought to admit — that C.D. was “just tickling” and that he would “eat” a classmate’s “privates” — were admissible nonhearsay; however, the chancellor correctly rejected the remaining statements, including statements to the Department of Human Services that C.D.’s father hurt his “pee pee” and statements to the Child Advocacy Center that C.D.’s father had touched him underneath his underwear in bed, as hearsay not within an exception. “ ‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove .the truth of the matter asserted.” Miss. R. Evid. 801(c). The statements made by C.D. that were not admitted include the following: (1) his statement to Dyess that he was “just tickling” when he was caught with his hands in an inappropriate part of a classmate’s body, (2) his statement to Dyess and Walker that he told another girl that he was going to “eat” her privates, (3) his statement to Dyess “[tjhat’s the way me and my daddy play,” and (4) his statements to the Department of Human Services and Child Advocacy Center during his interviews. The first two statements made to Dyess were admissible as nonhearsay. However, the third statement, while possessing potential nonhearsay aspects, was properly excluded, as were the statements made to the Department of Human Services and Child Advocacy Center, which were properly deemed hearsay.
¶ 17. The first two statements were not offered to prove the truth of the matter asserted, i.e., that C.D. was actually “just tickling” or that he was actually going to eat his classmate’s privates. The statements were offered to show that they had been said and not to show their truth. “If the significance of a statement is simply that it was made and there is no issue about the truth of the matter asserted, then the statement is not hearsay.” Harris v. State, 970 So.2d 151, 155 (¶ 12) (Miss.2007) (quoting Mickel v. State, 602 So.2d 1160, 1162 (Miss.1992)). See Brown v. State, 969 So.2d 855, 861 (¶ 16) (Miss.2007) (“[A]n out-of-court statement is not hearsay unless the party offering the statement is attempting to prove that the statement is true.”) The first two statements demonstrate why C.D. was brought to Dyess, as head of the daycare, by his teacher. Together with the third statement, the statements demonstrate why Dyess and Walker needed to report the incidents to the Department of Human Services and that the Department of Human Services subsequently investigated the family. The statements were not being used to prove the truth of what C.D. had said, but that C.D. had said them at all, prompting Dyess and Walker to properly report the incidents to the Department of Human Services. Accordingly, the trial court erred when it excluded the first two statements as hearsay.
¶ 18. The third statement to Dyess that “[tjhat’s the way me and my *203 daddy play” has both hearsay and non-hearsay aspects, depending on its use. Like the first two statements, it was important merely for being said. Although it may appear that Carla offered the third statement “to prove the truth of the matter asserted,” the statement in itself is of legal importance as C.D.’s utterance required, under Mississippi Code Section 43-21-358, that Dyess and Walker report to the Department of Human Services the suspected child abuse, as they promptly did on March 29, 2011. See Miss.Code Ann. § 43-21-353 (Rev.2009); Miss. R. Evid. 801. Often, as here, statements that are admissible for nonhearsay purposes may also have an impermissible hearsay aspect. Kenneth S. Broun, et al., eds., McCormick on Evidence § 249 (7th ed.2013). In such cases, the opposing party may request, under Rule 105, that the court “restrict the evidence to its proper scope and instruct the jury accordingly.” Miss. R. Evid. 105. While the chancellor sits as the fact-finder in chancery matters, the Mississippi Rules of Evidence, including Rule 105, also govern proceedings in chancery courts. See Miss. R. Evid. 101, .105.
¶ 19. Although the third statement potentially could be used for nonhearsay purposes, relevant evidence still may be excluded “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury_” Miss. R. Evid. 403. The third statement was the first to link C.D.’s father with the inappropriate acts and statements by C.D., thus necessitating the head of C.D.’s daycare and C.D.’s teacher to report the incidents to the Department of Human Services under Mississippi law. However, the third statement’s probative value in demonstrating why the incidents were reported to the Department of Human Services is limited in that the first two statements, while not as indicative of potential abuse as the third statement, still could be used to establish the circumstances requiring Department of Human Services intervention. Because the potential nonhearsay use of the third statement would be solely to show its effect on Dyess and Walker, which necessitated Department of Human Services reporting, the fact that the first two statements alone could show the same effect obviates the need to use the third statement. In other words, the probative value of the nonhearsay aspects of the third statement is substantially outweighed by the danger of undue prejudice from the hearsay aspects of the same statement. Further, the probative value of the third statement also is diminished in that the first two statements also could be used to establish why Dyess and Walker were required to report to the Department of Human Services. As such, the chancellor correctly excluded the third statement.
¶ 20. The statements made to the Department of Human Services and Child Advocacy Center are similar to the third statement in that they appear, on their face, to have been offered to prove the truth of the matter asserted — that C.D.’s father did hurt his “pee-pee” and that he had touched C.D., respectively. Unlike the first three statements, the statements to the Department of Human Services and Child Advocacy Center do not have potential nonhearsay purposes, as their effect on the listener lacks legal significance. In its final order, ■ the trial court stated “[t]he Court, during the trial, determined that the statements supposedly made by the minor child were nothing other than hearsay and not admissible.” The chancellor correctly determined that the statements made to the Department of Human Services and Child Advocacy Center were hearsay. Upon de novo review, the Court *204 finds that the statements to the Department of Human Services and Child Advocacy Center were hearsay as a matter of law and that the chancellor did not err in excluding them.
¶ 21. Having established that C.D.’s statements to the Department of Human Services and Child Advocacy Center were hearsay, the Court looks to possible-hearsay exceptions. Rule 803(25) defines the tender years hearsay exception, stating:
A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness: provided, that when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.
Miss. R. Evid. 803(25).
¶22. The trial judge found that C.D. was neither unavailable for testimony, nor did any of his statements describe “any act of sexual contact performed with or on the child by another....” Miss. R. Evid. 803(25). C.D. did not testify, and the trial judge and both attorneys stated that they would prefer that he did not. The chancellor discussed with counsel for both sides whether C.D. would be competent to testify, stating “I just can’t find myself believing a four-year-old ..p. child is capable to testify on something like this. It’s going to be hard to convince me to allow him to be questioned and cross-examined.” However, the chancellor did not make a finding as to C.D.’s competency, and neither party actually made an attempt to get C.D. to testify, although it was discussed. Thus, even if all of the other elements of the tender years exception were met, the possibility that C.D. was available as a witness but did not testify signifies that the tender years exception cannot be applied. See Miss. R. Evid. 803(25)(b). The chancellor considered all of the evidence before him and determined that the statements did not regard an act of sexual contact performed with or on C.D. and that there was no corroborative evidence of the alleged act, given that the Department of Human Services concluded that there was no evidence of abuse and ceased its investigation of Duff. The chancellor did not abuse his discretion, nor was he manifestly wrong in finding that the statements were inadmissible under the tender years exception.
¶23. Ultimately, the first two statements were not hearsay and should have been admitted. While the third statement does have potential nonhearsay aspects, its probative value is substantially outweighed by the danger of unfair prejudice, thus, it was properly excluded. The first two statements, however, were important merely because of the fact that they were said. “Where the fact that a particular statement was made is of itself a relevant fact, regardless of the truth or falsity of such statement, the statement is admissible in evidence as an independently relevant fact.” Jackson v. State, 527 So.2d 654, 656 (Miss.1988) (quoting Tolbert v. State, 407 So.2d 815, 821 (Miss.1981)). The first two statements were not being used to show the truth of the matter asserted but to show their effect on Dyess and Walker, who subsequently reported the incident to the Department of Human Services as they were required to do under Mississippi law. It was important in the context of the case to know that the child had made the statements, that a Department of Human Services investigation had *205 followed, and the result of the investigation. The Department of Human Services report was admitted into evidence, thus the first three statements were before the court. Further, neither party disputed the fact that the statements actually were made.
2. Whether the chancellor erred in forbidding the testimony of Dr. Benton and applied the incorrect “beyond a reasonable doubt” standard in making his rulings.
¶24. As part of her argument under the first issue, Carla also argued that the chancellor had erred in forbidding the testimony of Dr. Benton and in applying the “beyond reasonable doubt” standard in making his rulings. The Court addresses her argument separately for the sake of clarity.
¶ 25. In sustaining the objections to Dr. Benton’s testimony, the chancellor found that:
[T]he testimony used to support Dr. Benton’s conclusion that the visitation by the father should not be allowed, was based on nothing more than speculation and was therefore inadmissible. Dr. Benton didn’t give the opinion that there was sexual abuse. He did offer the opinion about protecting the child from visitation. In the Court’s opinion, such testimony is inadmissible because it is without basis in fact. In the case of Hill v. Mills, 26 So.3d 322, 329 (Miss.2010) this Court held: “expert testimony must proceed from what is known, and the expert must have knowledge that is more than subjective or unsupported speculation.”
On proffer, Dr. Benton testified that he disagreed with the Department of Human Services’ conclusion following the Child Advocacy Center interview. He also called the Department of Human Services investigation “worrisome,” and said he believed that there was a sufficient basis to substantiate the allegation of child abuse. The chancellor seemed to worry continually that his only option under Dr. Benton’s recommendation was to keep C.D. away from his father.
Court: So I’m either supposed to find that a child ought to be kept away from the father, because the father has a tendance [sic]—
Witness: I didn’t — I didn’t say that. I’ve never recommended that. During the investigation, yes. Let me be clear. My recommendation is that he has someone else with him while he’s with the child.
¶26. For unknown reasons, the chancellor seemed to feel that Duff deserved the same protections as a criminal defendant, stating: “[Depending what happens in this Court, he may be charged with a felonfy]. And I think he’s entitled to the same protection. And I think ... the expert testimony ought to rise to the level of ... beyond a reasonable doubt.” The chancellor appeared to be saying that, unless Dr. Benton could testify that Duff had sexually abused C.D. beyond a reasonable doubt, then the testimony was inadmissible. However, in his final written judgment of divorce and custody, he clarified that Dr. Benton’s testimony was not admissible because it was not relevant and reliable. After citing the relevant expert admissibility standards espoused in McKee v. Bowers Window & Door Co., Inc., 64 So.3d 926, 932 (Miss.2011), the chancellor stated:
Dr. Benton’s conclusions about “protective placement,” based strictly on one visit with the child wherein the child made no statement to him about sexual abuse and after having taken the history from the mother, Carla, amounts to a speculative, unsubstantiated, and unsup *206 ported opinion which this Court finds should not be admissible in evidence.
¶27. Carla argues that, even-if-Dr. Benton had direct contact with C.D. for just a few minutes, his reliance on C.D.’s statements to other adults and C.D.’s behavior is “necessarily the sort of evidence reasonably relied upon by an expert in child abuse.” Carla cites Elkins v. State, 918 So.2d 828, 831-32 (Miss.Ct.App.2005), for the proposition that, “[w]hile an expert may not opine' that an alleged child sex abuse victim has been truthful, the scope of permissible expert testimony under Rule 702 includes an expert’s opinion that the alleged victim’s characteristics are consistent with those of children who have been sexually abused.”
¶ 28. Dr. Benton is an expert on the subject of child sexual abuse. Experts in child sexual abuse routinely interpret statements made by alleged victims. However, child sexual abuse victims are often reticent to discuss their abuse. Lisa R. Askowitz & Michael H. Graham, The Reliability of Expert Psychological Testimony in Child Sexual Abuse Prosecutions, 15 Cardozo L. Rev. 2027, 2036 (1994) (“Contrary to the general expectation that the child would seek help, sexually abused children often do not report the abuse out of fear of being blamed for the incident or fear that no one will be able to protect them from retaliation by the abuser.”). Evidence of inappropriate statements or questionable behaviors exhibited by a child is necessary for an expert such as Dr. Benton to determine whether a child is in danger. Although C.D. did not tell Dr. Benton anything relevant in his own interview, Dr. Benton formed his opinion from his conversation with Tierra Oatis, the Department of Human Services worker, in which they discussed C.D.’s statements to the daycare workers, as well as his conversations with Carla as to the relevant events leading up to her visit with him, again including the statements made by C.D. to the daycare workers.
¶ 29. Dr. Benton concluded that “the mother had provided a history that was suggestive for sexual abuse of C.D. by his father.” He also recommended that C.D. be in protective placement until the investigation of his father was completed. • He did not conclude that C.D. actually had been abused. At trial, he testified that there was “probable cause to believe that [C.D.] may have been sexually abused.” Ultimately, on proffer, he recommended supervised visitation because it would ensure no abuse would occur and because it would protect Duffs reputation in the future. Dr. Benton was not permitted to testify based upon what he had viewed in the Child Advocacy Center interview video at trial, because the chancellor found that the statements in the video were inadmissable hearsay. The chancellor reasoned that allowing the video in evidence was similar to finding Duff guilty of a crime, stating that “this person, in that video, was not available for cross-examination. So to me, this case is almost like a criminal indictment. And a person is being charged with something that has laid a felon[y].”
¶ 30. Mississippi Rule of Evidence 703 permits an expert witness to base an opinion on facts, data, or opinions presented to the expert outside of court, without regard to whether such information has been or will be admitted, or whether a court would rule it inadmissible if counsel offered it into evidence. See Miss. R. Evid. 703. However, such information must be of a type reasonably relied upon by experts in their discipline in forming opinions or inferences upon the subject. Id. Rule 703 also provides that an expert may base his or her opinion, or inference on information perceived at trial, as in the case sub judice *207 when Dr. Benton heard the testimony pri- or to his own. Id.
¶ 31. Here, Dr. Benton, in forming his opinion, relied upon his own interview with C.D., Carla’s recitation of the events, which included C.D.’s own statements to the daycare workers, and finally a conversation with Tierra Oatis, the Department of Human Services worker. Of the three bases, the Court has found that C.D.’s first two statements to daycare workers were admissible, and the chancellor allowed Carla to testify at length at trial. Tierra Oatis also testified at trial; however, her testimony with respect to C.D.’s interviews with the Department of Human Services and Child Advocacy Center were deemed inadmissible. While the interviews were inadmissible at trial, an expert in child sexual abuse reasonably could rely on the statements obtained in the interviews, which C.D. himself made, when taken in conjunction with the other admissible bases upon which Dr. Benton relied.
¶ 32. Although the trial court could have, within its discretion, allowed Dr. Benton to testify as to his recommendations and his April 20, 2011, report to the Prentiss Police Department, the Court does not find that the trial court’s actions in excluding Dr. Benton’s testimony amounted to an abuse of discretion. In part, the real question presented here is how much inadmissible information can an expert witness rely on before the expert’s own testimony is unreliable and inadmissible? While the question may be close, the Court is not prepared to hold that the trial court abused its discretion when it found that Dr. Benton’s opinions rested upon too much.
¶ 33. While trial courts should be wary of allowing inadmissible testimony simply through the use of an expert witness, expert witnesses, under Rule 703, are permitted to rely on inadmissible evidence if it is the type reasonably relied upon by such experts. See Miss. R. Evid. -703. When faced with a Rule 703 situation, opposing counsel may then, in invoking Rule 705, thoroughly cross-examine the expert as to the facts or data underlying their opinion in an attempt to impeach the testimony. See Miss. R. Evid. 705.
¶ 34. The Court holds that the trial court did not abuse its discretion in not admitting Dr. Benton’s testimony. “When we say that the trial court has discretion in a matter, we imply that there is a limited right to be wrong.... [T]he statement imports a view that there are at least two different decisions that the trial court could have made ... which on appeal must be affirmed.” Burkett v. Burkett, 537 So.2d 443, 446 (Miss.1989). While Dr. Benton’s testimony could have been admitted, the trial court was within its discretion in not allowing it. Much of Dr. Benton’s testimony was based upon statements made by C.D., some of which the chancellor incorrectly deemed inadmissible. The chancellor seems to have discounted entirely the fact that Dr. Benton had talked with the Department of Human Services worker about C.D., in addition to his mother. It is important for an expert like Dr. Benton in situation in which child abuse is alleged to cultivate facts from multiple sources in order to get a clear picture of the potential dangers facing a child such as C.D. The Court is wary of discounting the testimony of a child-abuse expert simply because the information came from other credible sources and not personally from the child. Further, the Department of Human Services worker could corroborate Carla’s recitation of the events at least as to what transpired at the daycare.
¶ 35. The trial court did not abuse its discretion in excluding Dr. Benton’s testimony. However, because the *208 Court would reverse and remand on the previous hearsay issue, the trial court has the opportunity to analyze the issue further, especially in light of our holding that C.D.’s first two statements should have been admitted. It should be noted, however, that as an expert witness, Dr. Benton cannot simply act as a conduit for allowing hearsay or otherwise inadmissible testimony at trial; rather, as to the inadmissible statements, he may testify, within the trial court’s discretion, as to whether or not, in his opinion, C.D.’s characteristics are consistent with those of sexually abused children. In other words, “[w]hile ... an expert may not offer an opinion as to ... whether the alleged child sexual abuse victim has been truthful,” it is permissible “for an expert to testify regarding his or her opinion that the alleged victim’s characteristics are consistent with a child who has been sexually abused.” Bishop v. State, 982 So.2d 371, 381 (¶ 33) (Miss.2008).
¶ 36.. As for Carla’s contention that the chancellor used an improper “beyond a reasonable doubt” standard in making his ruling, the Court finds that it lacks merit. At the hearing, the chancellor did make statements that indicated that he felt Carla’s burden of proof was higher than a preponderance of the evidence. However, his final written order utilizes the proper standard: the chancellor conducted his own Albright analysis, he found that Dr. Benton’s testimony was unreliable, irrelevant, unsubstantiated, and therefore inadmissible, and he found that the statements made by C.D. were inadmissible hearsay. Nowhere in the order did he state that the Carla’s burden of proof had been raised. Therefore, the issue is without merit.
3. Whether the chancellor’s failure to state why he did not follow the guardian ad litem’s recommendations constitutes reversible error.
¶ 37. The chancellor considered the guardian ad litem’s initial report from September 2011, her supplemental report from November 2011, and her updated and supplemental report from March 2012. In his final order, he stated that the guardian ad litem “spent an unusual amount of time in the performance of her duties because of the allegations of sexual abuse upon a minor child by the father.” In the November report, the guardian ad" litem recommended that it was “in the best interest of the minor child herein, to remain in his mother’s home during the school year and the father should have the child during the summer.” The day that report was filed, the chancellor held the second of the three hearings on the matter and determined that each parent would have custody of C.D. for alternating two-week periods. Before the hearing on March 1, 2012, the guardian ad litem submitted her updated report, stating: “I do not recommend a continuation of the two week exchange of this minor child as it does not provide the stability/continuity that is in the child’s best interest.” After that hearing, the chancellor rendered his final judgment on August 6, 2012, in which he conducted his own Albright analysis, weighed the factors in Duffs favor, and disagreed with the guardian ad litem’s recommendation made in November 2011. Instead of giving custody to Carla for the school year and Duff for the summer, the chancellor gave custody to Duff for the school year and Carla for the summer.
¶ 38. In Floyd v. Floyd, the Court held that if a court rejects the recommendations of a guardian ad litem, it must detail its rationale for doing so:
This Court has held that a chancellor shall at least include a summary review of the recommendations of the guardian in the court’s findings of fact when the appointment of a guardian is required by law. S.N.C. v. J.R.D., Jr., 755 So.2d *209 [1077,] 1082 [ (Miss.2000) ]. Furthermore, if the court rejects the recommendations of the guardian, the court’s findings must include its reasons for rejecting the guardian’s recommendations. Id. While a chancellor is in no way bound by a guardian’s recommendations, a summary of these recommendations in addition to his reasons for not adopting the recommendations is required in the chancellor’s findings of fact and conclusions of law. Id., Hensarling v. Hensarling, 824 So.2d 583, 587 (Miss.2002).
Floyd v. Floyd, 949 So.2d 26, 29 (¶ 8) (Miss.2007) (emphasis added). In Floyd, “the chancellor’s opinion lacked both ... elements,” and the Court reversed and remanded the chancellor’s holding “with instructions to make specific findings with regard to the guardian’s report.” Id.
¶ 39. Here, the chancellor did not detail why he disagreed with the guardian ad litem. He did, however, render a thorough Albright analysis, often citing the guardian ad litem’s report, to support his conclusion. In fact, the chancellor and the guardian ad litem agreed on eight of the twelve Albright factors, although the chancellor did not always note his agreement. Of the four factors on which the chancellor and the guardian ad litem disagreed, the chancellor specifically referenced the guardian ad litem’s recommendations only as to the factors of “parenting skills” and “emotional ties of parents and child.” As to the “moral fitness and parenting skills” factor, the chancellor simply referred to his discussion of the “emotional ties of parents and child.” Finally, as to the catchall twelfth factor, which includes all other relevant factors, the guardian ad litem simply noted “allegations of abuse” without determining which side was favored. The chancellor did not refer to the guardian ad litem report but did discuss the allegations of abuse, which the chancellor deemed “inaccurate” and “unsubstantiated.” In each instance of disagreement, the chancellor weighed the factor in favor of the father, while the guardian ad litem weighed the first three as neutral, without commenting which parent the catchall factor favored. Generally, the chancellor weighed the factors toward Duff because he felt that Carla’s unsubstantiated allegations of abuse were disrupting the child’s equilibrium and interfering with Duffs ability to parent C.D.
¶ 40. “The chancellor was in no way bound to follow the recommendation made by the [guardian ad litem].” Hensarling v. Hensarling, 824 So.2d 583, 587 (¶ 10) (Miss.2002). Under the Court’s standard of review, the Court does not find that the chancellor’s determination was manifestly wrong or that he abused his discretion.
In any case where a GAL is appointed to represent a child, the chancellor’s role as fact-finder requires the evidence presented by the GAL, as well as all other relevant evidence, to be considered and given such weight as the chancellor determines it deserves. Thus, the question to be answered by the Court is not ... whether the chancellor ignored the GAL’s recommendation; but rather, whether the evidence in the record supports the chancellor’s decision.
Lorenz v. Strait, 987 So.2d 427, 431 (¶ 16) (Miss.2008) (internal citations omitted). In the case sub judice, the chancellor considered the guardian ad litem’s recommendations and conducted his own analysis of the Albright factors. The chancellor was the fact-finder, and his holding made clear the reasons for his decision. While it is the better practice for a chancellor to describe specifically why he or she disagrees with a guardian ad litem’s findings, the Court cannot find that the chancellor in the in *210 stant case abused his discretion in reaching the result he reached. Therefore, the issue is without merit.
4. Whether the chancellor’s holding was against the overwhelming weight of the evidence.
¶41. Because the Court reverses and remands on the first hearsay issue, further discussion regarding the weight of the evidence would be superfluous, and we do not reach the issue.

CONCLUSION

¶ 42. The chancellor erred in refusing to admit the first two statements made by C.D. to his daycare teacher and principal, which prompted them to report the incidents to the Department of Human Services. The statements were not hearsay, because they were being offered to show their effect on C.D.’s teacher and principal, who acted accordingly. However, the remaining statements were properly ruled as inadmissible, because they were offered to show the truth of. the matter asserted, specifically, that Duff had committed child abuse, or, in the case of the third statement, the probative value of the nonhear-say aspects was substantially outweighed by the danger of undue prejudice.
¶43. The chancellor did not abuse his discretion in refusing to admit the testimony of Dr. Benton. While the chancellor could have allowed Dr. Benton’s testimony under Mississippi Rule of Evidence 703, his refusal to do so did not amount to an abuse of discretion. Further, on remand, the chancellor has the opportunity to revisit his decision in light of our holding as to C.D.’s nonhearsay statements.
¶ 44. The chancellor did not use the wrong standard in reaching his determination. The chancellor’s ultimate determination of custody was firmly based in his rigorous analysis of the Albright factors; therefore, the issue is without merit. Finally, although the chancellor did not specifically lay out why he disagreed with the guardian ad litem’s recommendation for custody and visitation, he conducted a thorough Albright analysis and clearly considered the guardian ad litem’s multiple reports. His reasons for his ruling are apparent from the record, and the Court does not find that he was manifestly wrong or that he abused his discretion.
¶ 45. The Court reverses the chancellor’s decision and remands the case for new findings of fact and conclusions of law in which the first two statements made by C.D. to Dyess and Walker are considered as admissible evidence. Because of the additional evidence, the chancellor also should conduct a new Albright analysis showing the reasons for his ruling, and it would be helpful if he specifically stated why he disagreed with the guardian ad litem’s recommendations.
¶ 46. REVERSED AND REMANDED.
WALLER, C.J., DICKINSON, P.J., KITCHENS, CHANDLER, AND PIERCE, JJ., CONCUR. RANDOLPH, P.J., AND LAMAR, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. KING, J., NOT PARTICIPATING.

. Carla’s attorney proffered Dyess’s testimony. The chancellor eventually refused to admit the statements of C.D., holding that they were hearsay.

. Carla’s attorney also proffered Walker's statement. The initial Department of Human Services report, dated March 29, 2011, states that C.D. actually said "I’m going to eat your p* * *y_” However, in proffered testimony at trial, Dyess and Walker stated that the exact statement was “I'm going to eat your privates.”

. Albright v. Albright, 437 So.2d 1003 (Miss.1983).

. See Miss. R. Evid. 803(25).