WILSON, J.,
FOR THE COURT:
¶ 1. Dennis Thompson was found guilty of murder and three counts of aggravated assault following a jury trial in the Oktib-beha County Circuit Court. On appeal, Thompson argues that the trial court (1) “improperly allow[ed] the State to introduce rebuttal testimony” and (2) erred “in refusing all ... [j]ury [i]nstruction[s] offered by the defense,” including certain proposed instructions on the concept of reasonable doubt. We conclude that the trial court did not abuse its discretion by allowing a rebuttal witness or by denying the requested instructions. Therefore, we affirm Thompson’s convictions and sentences.
FACTS AND PROCEDURAL HISTORY
¶2. Around 1 a.m. on May 22, 2010, a large number of people had gathered near the intersection of Highway 182 and North Washington Street in Starkville. Groups were milling about and talking on both sides of Highway 182, primarily near a Texaco on the south side of the street and around Club 124, where a high school graduation party was just ending, on the north side of the street. Following a physical altercation near the intersection, gunshots were fired that resulted in the death of C.K. Randle and injuries to three others. .
¶ 3. Thompson was arrested in connection with the shooting and was indicted for depraved heart murder, Miss. Code Ann.§ 97—3—19(l)(b) (Rev. 2006), and three counts of aggravated assault, Miss. Code Ann. § 97-3-7(2). Thompson’s' case proceeded to trial on October 27-31, 2014. At trial, the jury heard ’from eight witnesses to the shooting and/or the events leading up to it.
¶ 4. Lavsha King testified that she was standing in the Texaco parking lot when she heard a commotion and saw a crowd of at least ten to fifteen people walking toward Highway 182. The crowd was walking toward a man who was standing in the street. King did not know the man, but she said he was wearing a white shirt and had dreadlocks.[1] King testified that a Chevrolet Avalanche drove up near the man, and the man spoke briefly to the driver and then “reached into the back seat” of the vehicle. When the man turned back toward the approaching crowd, he had a gun and “came out shooting.” According to King, the man fired more than five shots as the crowd scattered. The man then dove through the back window of the Avalanche, which sped off west on Highway 182. King then realized that Randle, who was a friend of her brother, had been shot. King immediately called 911.
¶ 5. Azaria Ross testified that she was standing in the Texaco parking lot when her brother, Tavion Pegues, saw Thompson and said, “Let’s get this n****r.” Mike Smith then walked up to Thompson, who was standing in the street, and punched him. Ross testified that Thompson stumbled back, and a group of five to ten people advanced toward him, but Thompson then regained his balance and pulled a gün from his • pants. Ross did not actually see Thompson fire the gun, but she testified that she heard multiple gunshots immediately after she saw him pull the gun. Ross was strhck by one of the bullets. Her brother and his friends took her to the hospital.
*1048 ¶ 6. Smith’s brother, Tony Harris, was also in the Texaco parking lot prior to the shooting. Harris testified that Smith and Thompson argued, Thompson approached Smith, and then Smith punched Thompson. Harris testified that Thompson then pulled out a gun and began shooting. Harris was struck by one of the bullets and was' taken to the hospital.
¶7. Devierre Outlaw was standing a short distance down the street when the shooting occurred. He testified that he saw Smith punch Thompson in the face, and then Thompson pulled out a gun and started shooting. Outlaw testified that, because it was dark outside, he could not see the gun, but he saw the gunfire and heard the shots. Outlaw was shot in the elbow and in the abdomen, and an ambulance took him to the hospital'.
¶ 8. McKenzie Rogers testified that he was across the street when he saw thirty to forty people approaching Thompson in the Texaco parking lot. Rogers testified that the group appeared to be “preparing to fight.” According to Rogers, an SUV then pulled up near the Texaco , in the middle of Highway 182, which blocked his view of Thompson. Rogers next heard five or six gunshots, and then the SUV sped off. Rogers saw 'that Randle had been shot and tried to perform CPR on him until law enforcement arrived.
¶ 9. Jason Zuber, a defense witness, testified that he was standing across the street from the Texaco when he saw Thompson arguing with a group of ten to fifteen men. Zuber testified that Thompson tried to walk away, but one of the men followed Thompson into Highway 182 and punched him in the face. According to Zuber, the rest of the group then rushed toward Thompson, blocking his view. Zu-ber then heard gunshots, but he could not see the shooter. Zuber claimed that he heard more than one set of gunshots and that the shots were coming from different locations and directions.. :
¶ 10, Christopher Harris, a close friend of Thompson, testified that he had been with Thompson since approximately 6 p.m. that evening and that he" did not see Thompson with a gun at any time that night. On their way to the party at Club 124, Thompson and Harris stopped" at the Texaco, and Thompson went inside to buy a drink and some chips. Harris testified that as Thompson exited the .Texaco, Smith and several others outside began harassing Thompson. Harris testified that he stepped between Thompson and the group to try to avoid trouble. Then one of Thompson’s “kin” pulled up in the street in a “track,” and Harris encouraged Thompson to get, in the truck and leave, Harris testified that as Thompson walked toward the track, Smith ran forward and hit Thompson. According to Harris, a crowd of twenty or thirty people then ran toward Thompson so that he could not see Thompson. Harris then heard gunshots, and the crowd took off running in different directions. .Harris testified that he heard approximately six gunshots, but he believed that the shots came from different guns and from different directions.
¶ 11. Justin Yarbrough testified that Smith and several" others had jumped him outside of Club 124 a short time before the shooting. According to Yarbrough, the group attacked him and kicked and beat him severely. Yarbrough never reported the incident to the police. He testified that he was sitting in a car nearby when shots were fired and that he did not see the shooting.
¶ 12. Officers from the Starkville Police Department were on the scene within minutes of the shooting. They recovered six shell casings within twenty feet of Randle’s body. All were Smith & Wesson .40 caliber *1049 shells. No other type of shell casing was recovered.
¶ 13. After the defense rested, the State announced that it would call Landon Stamps, a former Starkville Police Department detective,- as a rebuttal witness. Stamps had interviewed Thompson shortly after .the shooting, and the State’ intended to introduce the approximately thirty-minute yideo of the interview through Stamps. Thompson objected that Stamps’s testimony and the recorded interview were improper rebuttal and should have been offered in the State’s case-in-chief. However, the State responded that the interview, in which Thompson admitted to firing a .40 caliber handgun about six times, was admissible to rebut the testimony of Harris and Zuber. The State explained that it did not introduce the interview in its case-in-chief because it considered it a self-serving claim of self-defense. However, once Harris suggested that Thompson did not have a gun, and Harris and Zuber suggested that there were other shooters, the video was proper rebuttal evidence. The trial judge overruled Thompson’s objection but also ruled that Thompson would be allowed to offer appropriate surrebuttal evidence.
¶ 14. At Thompson’s request, the 'trial judge agreed to view Thompson’s recorded statement outside the presence of the jury before making a final ruling on its admissibility, While the video was. being played for the judge, co-counsel for the defense—• Mr. Lumumba and Mr.. Lawrence—-made the following statements:
BY MR. LUMUMBA: (Speaking over audio) Let it in, Your Honor..
BY MR. LAWRENCE: (Speaking over audio) Please let it in. Please. We can stop now.
BY THE COURT: (Speaking over audio) All right. All right, we can turn that off.
(Whereupon the video playing in open court was paused.)
BY MR. LAWRENCE: Innocent.
BY THE COURT: Now, you’ve withdrawn your objection to the admission of the statement; is that correct?
BY MR. LUMUMBA: (Nods head affirmatively),
BY THE COURT: All right. Would that—there’s nothing left for the Court to rule on. However, I do believe you mentioned earlier that there was a statement at the 29th minute—
BY MR. LUMUMBA: Yes.
BY THE COURT: —and that you wanted that portion redacted; is that correct?
BY MR. LUMUMBA: Yeah, I’d ask the State how far do y’all want to go? Y’all want the whole thing to be—be heard?
BY MR. LAWRENCE: I want the whole thing to be heard.
Following a brief recess, the court asked counsel to again confirm that Thompson had “withdrawn his objections” to the recorded statement on the ground that it was improper rebuttal. Mr., Lawrence answered, “Yes, Your Honor, we have at this time.”
¶ 15, Stamps then testified, and Thompson’s recorded interview was played for the jury. During the interview, Thompson admitted that he had. fired “about six” shots with a .40 caliber handgun. Thompson told Stamps that he had dropped the handgun at-the scene before jumping into his cousin’s vehicle., During the interview, Thompson did not claim that anyone else had fired a gun. After a brief surrebuttal witness, the defense finally rested.
¶ 16. The case was submitted to the jury, and the jury found Thompson guilty of depraved heart murder[2] and on all *1050 three counts of aggravated assault. The court sentenced Thompson to thirty years in the custody of the Mississippi Department of Corrections (MDOC) for murder.[3] The court also sentenced Thompson to five years in MDOC custody on each count of aggravated assault, with two of the five-year sentences to run consecutively to one another and to the murder sentence, and one five-year sentence to run concurrently to the murder sentence. Thompson subsequently filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a timely notice of appeal. As noted above, Thompson argues that the trial court erred by allowing the State to introduce rebuttal testimony and by refusing all of his proposed jury instructions.
DISCUSSION
I. Rebuttal Witness
¶ 17. As discussed above, Thompson’s counsel expressly withdrew his objection to the introduction of his recorded interview. In fact, both of his attorneys expressly stated that they wanted the jury to hear the interview. Accordingly, Thompson waived any objection to the videotaped interview. Baxter v. State, 177 So.3d 423, 441 (¶ 47) (Miss. Ct. App. 2014), aff'd, 177 So.3d 394, 398 n.2 (Miss. 2015). Aside from Stamps’s role as the sponsoring witness for the recorded interview, his testimony had little significance', and Thompson identifies no specific testimony that prejudiced him. Therefore, we conclude that Thompson waived any objection to Stamps’s testimony or the introduction of his recorded interview.
¶ 18. In any event, the trial judge did not abuse his discretion by allówing Stamps to testify in rebuttal. The decision whether to allow rebuttal testimony is committed to ’the discretion of the trial judge, and we will reverse only for an abuse of discretion. Armstrong v. State, 771 So.2d 988, 999 (¶ 48) (Miss. Ct. App. 2000). In general, the State “must offer all substantive evidence in its case-in-chief.” Id, However, the State is entitled to present “rebuttal testimony ... to explain, repel, counteract or disprove evidence” offered by the defense. Williams v. State, 539 So.2d 1049, 1051 (Miss. 1989). Moreover,
the court should resolve [any] doubt in favor of the reception in rebuttal [if] (1) its reception will not consume so much additional time as to give an undue weight in practical probative force to the evidence so received in rebuttal, ... (2) the opposite party would be substantially as well prepared to meet it by surre-buttal as if the. testimony had been offered-in chief, and (3) the opposite party upon request therefor is given the opportunity to reply by surrebuttal.
Riley v. State, 248 Miss. 177, 186, 157 So.2d 381, 385 (1963) (quoting Roney v. State, 167 Miss. 827, 150 So. 774, 775-76 (1933)). “[The Mississippi Supreme] Court has advocated a liberal application of the rebuttal evidence rule.” McGaughy v. State, 742 So.2d 1091, 1094 (¶ 19) (Miss. 1999) (quoting Powell v. State, 662 So.2d 1095, 1098 (Miss. 1995)).
■ ¶ 19. Thompson’s counsel argued in his opening statement that this was “a clear case of self-defense.” The State then presented its case-in-chief directed to rebutting Thompson’s claim of self-defense. After the State rested, the defense called Harris, who had been with Thompson throughout the evening leading up to the *1051 shooting. On direct-examination and again on redirect, defense counsel elicited-testimony from Harris that he had not seen Thompson with a gun at any point during the evening. The apparent purpose of this testimony was to suggest to the jury that Thompson did not even have a gun, much less fire one. In addition, Harris and Zuber both testified that they believed that shots were fired from multiple guns, from different locations, and in different directions.
¶ 20. It was not an abuse of discretion to permit the State to counteract Harris’s testimony by introducing Thompson’s recorded interview, in which he clearly admitted to firing a gun. Williams, 539 So.2d at 1051. It is understandable that the State did not use the interview in its case-in-chief, as Thompson did not confess to murder but rather claimed self-defense based on his own version of events. Once the defense introduced evidence suggesting that Thompson did not have a gun, the trial judge was within his discretion to allow the State to . introduce the recorded interview in rebuttal. See Armstrong, 771 So.2d at 998-1000 (¶¶ 47-49) (eyewitness was properly allowed to testify to rebut defendant’s claim that he did not have a gun at the crime scene).
¶21. In addition, the interview was proper rebuttal of Harris’s and Zuber’s testimony that shots were fired from different guns in different directions. In the recorded interview, Thompson stated that he fired “about six” shots from his .40 caliber handgun, which matched and explained the evidence collected at the scene. During the interview, Thompson did not mention anyone else firing a gun during the incident. Thus, Thompson’s recorded interview was properly admitted to counteract this aspect of Harris’s and Zuber’s testimony as well. Williams, 539 So.2d at 1051.
¶ 22, Finally, although we are firm-, ly convinced that Stamps’s testimony and the recorded interview were proper rebuttal evidence, even if there were some “doubt” as to the issue, we would not find an abuse of discretion. See Riley, 248 Miss. at 186, 157 So.2d at 385. Under Mississippi Supreme Court precedent, any “doubt” was properly resolved in favor of admission because'(1) Stamps’s testimony was brief, (2) Thompson should have been prepared to respond to the recorded interview, which was the subject of a pretrial motion to suppress, and (3) Thompson was allowed to reply by surrebuttal. See id. The trial judge properly considered these factors and did not abuse his discretion by allowing Stamps to testify in rebuttal.[4]
II. Jury Instructions
¶ 23. In his second assignment of error, Thompson argues that the trial court erred by refusing all fifteen of his proposed jury instructions. However,Thompson only providés supporting argument for his assertions that the trial court erred in refusing three instructions: D-l, D-2, and D-3. “It is a longstanding principle of law that if an appellant fails to *1052 support her allegation of error with argument or authority, this Court need not consider the issue.” Jordan v. State, 995 So.2d 94, 103 (¶ 14) (Miss. 2008) (quotation marks, alterations omitted). Accordingly, the issue is procedurally barred except with regard, to alleged errors involved in the denial of proposed jury instructions D-1, D-2, and D-3. See id, In addition, during oral argument before this Court, defense counsel voluntarily conceded that the denial of D-l was not reversible error, as it was fairly covered elsewhere in the jury instructions. Accordingly, we limit our discussion to proposed instructions D-2 and D-3.
¶24. We review the deniaLof jury instructions for abuse of discretion only. Quinn v. State, 191 So.3d 1227, 1231-32 (¶ 18) (Miss. 2016). Our standard of review “is well-established”:
.Jury instructions , must be; read .as a .whole to determine if the instructions were proper. Jury instructions must fairly announce the law of. the case and not create an injustice against the defendant. This rule is summed up as follows: In other words, if all instructions taken as a. whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.
Davis v. State, 18 So.3d 842, 847 (¶ 14) (Miss. 2009) (citations, quotation marks omitted).
A. Proposed Instruction D-2
¶ 25. Thompson’s proposed instruction D-2 stated as follows:
The 'Court instructs the jury that you are bound, in deliberating-on this case, to give the, defendant the , benefit of any reasonable doubt of the defendant’s guilt that arises out of the evidence or want of evidence in this case. There‘is always a reasonable doubt of the defendant’s guilt when the evidence simply makes it probable that the defendant is guilty. Mere probability of guilt will never warrant you .to- convict the defendant. It is- only when, after examining the evidence on -the whole, you are able to say on your oath, beyond a reasonable doubt,- that the defendant is guilty that the law will permit you to find him guilty. You might be able to say that you believe him to be guilty and yet, if you are not able to say on your oaths, beyond a reasonable doubt, that he is guilty it is your sworn duty to find the defendant “Not Guilty.”
¶26. In Fulgham v. State, 46 So.3d 315 (Miss. 2010), the Supreme Court held that a substantively identical instruction was an improper “attempt[ ] to define -reasonable doubt,’ ” Id. at 332 (¶ 46). The Court explained that it “has long held that a definí-, tion of reasonable doubt is not a proper instruction for the jury; ‘reasonable doubt defines itself.’” Id. (alteration omitted) (quoting Barnes v. State, 532 So.2d 1231, 1235 (Miss. 1988)). The Fulgham Court held that the trial judge did not abuse his discretion by denying the very same reasonable doubt.instruction at issue here. Id. It follows that the trial judge in this case did not abuse his discretion by denying proposed instruction D-2. Thompson’s argument is without merit,
B. Proposed Instruction' D-3
¶ 27. Thompson’s proposed instruction D-3 stated as follows:
The Court instructs the jury that a reasonable doubt may arise from the whole of the evidence, the conflict of the evidence,, the lack of evidence, or the insufficiency of the evidence; but however it arises, if it arises, it is your sworn duty to find the defendant “Not Guilty.”
¶28. In another murder case decided . last year, the Supreme Court held that the denial of this same instruction was not an abuse of discretion. Roby v. State, 183 *1053 So.3d 857, 874 (¶ 69) (Miss. 2016). The trial judge in Roby refused this instruction as “argumentative.” Id, On appeal, the Supreme Court held that “regardless of the judge’s reason for refusing [the instruction], we find that he did not abuse his discretion, as the concept of reasonable doubt was covered extensively by other instructions. This issue is without merit.” Id, '
¶ 29. Roby is dispositive of Thompson’s argument that the trial judge abused his discretion and committed reversible error by refusing proposed instruction D-3. Thompson’s proposed instruction D-3 is the same instruction that was refused in Roby, and there is no meaningful difference between the reasonable doubt instructions that were given in this case and those that were given in the murder trial in Roby.[See id. at (¶68). In fact, a full review of the record in Roby shows that the relevant instructions in that case were essentially identical to those given in this case.
¶ 30. The jury in this case was instructed on the requirement of proof beyond a reasonable doubt. Instruction C.01 told the jury that its “verdict should be based on the evidence and not upon speculation, guesswork, or conjecture.” Instruction 0.12(a) instructed the jury:
The law presumes every, person charged with the commission of a crime to be innocent. This presumption places upon the State the burden of proving the Defendant guilty beyond a reasonable doubt. The presumption of innocence attends the Defendant throughout the trial or until it is overcome by evidence which satisfies the jury of his guilt 'beyond a reasonable doubt. The. Defendant is not required to prove his innocence.
In addition, instructions S-2A, S-3A, S-4A, and S-5A provided: “If the State has failed to prove any one or more of the ,.. elements [of the charged offense] beyond a reasonable doubt, then you shall find the Defendant not guilty ...Finally, S-6A instructed: “If the State has failed to prove to you beyond a reasonable doubt that the Defendant did not act in reasonable self-defense,-then you shall find the Defendant not guilty.”
¶ 31. The instruction refused in this case is the same one refused in Roby, and there is no meaningful difference between the reasonable doubt instructions given in this case and those given in Roby. In Roby, the Court held that the instructions that were given fairly and “extensively” covered “the concept of reasonable doubt,” that the trial judge did not abuse his discretion by refusing the additional requested instruction, and that the issue was “without merit.” Roby, 183 So.3d at 874 ( ¶ 69). Roby’s holding' clearly and inescapably requires the rejection of Thompson’s virtually identical argument in this case.[5]
*1054 ¶ 32. Nor did the trial judge abuse his discretion by not giving D-S in response to a note from the jury.[6] The Supreme Court has recognized that “[o]ne of the most nettlesome problems faced by a circuit judge is an inquiry from the jury when it has retired to reach its verdict.” Girton v. State, 446 So.2d 570, 572 (Miss. 1984). The appropriate response to such an inquiry is committed to the discretion of the trial judge. Galloway v. State, 122 So.3d 614, 634 (¶ 13) (Miss. 2013). “Unless the trial court based [its] decision on an erroneous view of the law, this Court is not authorized to reverse for an abuse of discretion absent a finding the trial court’s decision was ‘arbitrary and clearly erroneous.’” Id. (quoting Hooten v. State, 492 So.2d 948, 950 (Miss. 1986) (Hawkins, P.J., dissenting)). We will not reverse simply because we think “the trial court was ‘right or wrong’ in its response.” Id.
¶ 33. The jury’s note in this case simply read: “What if we have a number of jurors that feel like there is not enough evidence to prove or disprove reach a verdict?” [7] The note did not request clarification or further instruction on the concept of reasonable doubt. It simply reflected that deliberations had not yet produced a unanimous verdict. After consulting with counsel, the trial judge instructed the jurors to “continue ... deliberations” to determine whether in good conscience they could reach a verdict, while also reminding them “not to surrender [their] honest convictions as to the weight or effect of the evidence solely because of the opinion of [their] fellow jurors or for the mere purpose of returning a verdict.” This was a proper response to the note. See Sharplin v. State, 330 So.2d 591, 596 (Miss. 1976). The judge also instructed the jurors that they had been “adequately instructed ... concerning the law” and “to read all the instructions already given to [them] by the Court.” As discussed above, under binding precedent, those instructions fairly and adequately covered the concept of reasonable doubt. Roby, 183 So.3d at 874 (¶¶ 68-69). “The jury is presumed to have followed [those] instructions.” Galloway, 122 So.3d at 634 (¶ 36). Thus, the trial judge’s response to the jury’s inquiry was entirely appropriate. In fact, counsel for Thompson twice stated that they had no objection to the judge’s proposed response. The trial judge committed no abuse of discretion in response to the jury’s note.
¶ 34. The dissent notes that D-3 has been given in a number of cases,[8] but that hardly establishes that its refusal is an abuse of discretion. “When we say that the trial court has discretion in a matter, we imply that there is a limited right to be wrong. The statement imports a view that there are at least two different decisions that the trial court could have made which on appeal must be affirmed.” Darnell v. Darnell, 167 So.3d 195, 207 (¶ 34) (Miss. *1055 2014) (quoting Burkett v. Burkett, 537 So.2d 443, 446 (Miss. 1989)) (emphasis added; alterations omitted). A trial judge’s discretion to give an instruction does not equate to a rule that he must give it. The Supreme Court specifically held in Roby that the refusal of this instruction was not an abuse of discretion.
¶35. Finally, in a footnote, the dissent asserts that Roby is distinguishable for two reasons: “in Roby, [1] the defense raised no objection to the trial court’s denial of the proposed instruction, and ... [2] the supreme court found that the instruction was extensively covered by other instructions.” Post at n.9. The former point is irrelevant. The defendant in Roby offered the exact same instruction, and it was refused by the trial court, thereby preserving the issue for appellate review. Nothing in the Roby opinion suggests that the issue was waived. A defendant is not required to “object” to the denial of his own instruction. Rubenstein v. State, 941 So.2d 735, 789 (¶¶ 248-49) (Miss. 2006). The Supreme Court has clearly held that a defendant need only tender a proposed instruction to preserve the issue for review. Id. (“Requiring a party to object to the refusal of its own jury instructions would be illogical and oppressive .... ”).
¶36. The dissent’s second basis for distinguishing Roby—the “other instructions” given in that case—is refuted by the opinion and record in Roby. In Roby, the Supreme Court held that “the concept of reasonable doubt was covered extensively by other instructions.” Roby, 183 So.3d at 874 (¶ 69). To reiterate, a review of the record in Roby reveals no instruction on the concept of reasonable doubt that was not given at Thompson’s trial. The dissent identifies no material difference between the instructions given in this case and in Roby. There is none. The Supreme Court held that those instructions are fair and sufficient, and this Court cannot overrule Supreme Court precedent. We are bound by Roby and the principle that “like cases ought to be decided alike.” State ex rel. Moore v. Molpus, 578 So.2d 624, 634 (Miss. 1991).
¶37. In summary, Mississippi S.upreme Court precedent makes clear that the trial judge did not abuse his discretion by denying proposed instructions D-2 and D-3. Read as a whole, the jury instructions at Thompson’s trial fairly announced the applicable rules of law.
CONCLUSION
¶ 38. The trial judge did not abuse his discretion by allowing rebuttal evidence or refusing Thompson’s proposed jury instructions. Therefore, we affirm Thompson’s convictions and sentences.
¶ 39. THE JUDGMENT OF THE OK-TIBBEHA COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MURDER, AND SENTENCE OF THIRTY YEARS; COUNT II, AGGRAVATED ASSAULT, AND SENTENCE OF FIVE YEARS, WITH THE SENTENCE TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I; COUNT III, AGGRAVATED ASSAULT, AND SENTENCE OF FIVE YEARS, WITH THE SENTENCE TO RUN CONCURRENTLY WITH THE SENTENCE IN COUNT I; AND COUNT IV, AGGRAVATED ASSAULT, AND SENTENCE OF FIVE YEARS, WITH THE SENTENCE TO RUN CONSECUTIVELY TO THE SENTENCES IN COUNTS I AND II, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO OKTIB-BEHA COUNTY.
LEE, C.J., GRIFFIS, P.J., ISHEE, FAIR AND GREENLEE, JJ., CONCUR. *1056 CARLTON, J., DISSENTS WITH : SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., AND • BARNES, J. WESTBROOKS, J., NOT PARTICIPATING.

. Thompson had dreadlocks at the time of the shooting.

. No manslaughter instructions were requested or given,

. The circuit court applied the amended (lesser) sentencing provision applicable to second-degree murder, effective July 1, 2013. See Miss. Code Ann. § 97-3-19(l)(b) and -21(2) (Rev. 2014).

. The Supreme Court has also held that the admission of rebuttal testimony "doe's not . constitute reversible error, unless it is shown that no opportunity is afforded the defendant to reply by surrebuttal testimony.” Myers v. State, 353 So.2d 1364, 1369 (Miss. 1978) (citing Gant v. State, 219 Miss. 800, 803, 70 So.2d 28, 29 (1954)). Thompson was allowed to and did present surrebuttal testimony, and his recorded statement set forth his own claim of self-defense. Under the circumstances, even if Stamps's testimony should not have been admitted in rebuttal, its admission would not require reversal. See, e.g., Cox v. State, 849 So.2d 1257, 1268 (¶ 36) (Miss. 2003) ("Reversal [based on an erroneous evi-dentiary ruling] is proper only where [the trial court's] discretion has been abused and a substantial right of a party has been affected.”).

. Roby was decided after the trial in this case. In refusing Thompson's proposed instruction D-3, the trial judge relied on the Supreme Court’s decision in Hunter v. State, 489 So.2d 1086, 1088-89 (Miss. 1986). The dissent argues that Hunter is distinguishable because of minor differences between proposed instruction D-3 and the instruction that the Supreme Court disapproved in Hunter. The instructions are basically identical except that the instruction in Hunter stated that the existence of reasonable doubt "both justifies and demands, under your oaths, that you return a verdict of 'Not Guilty.’ ” Id. at 1089. The Supreme Court disapproved of the instruction as "argumentative and ... abstract.” Id, Here, D-3 stated that if reasonable doubt existed, it was the jury’s "sworn duty to find the defendant 'Not Guilty.’ ” There is no meaningful difference between' D-3 and the instruction disapproved in Hunter. To say that á jury has a "sworn duty” to return a not-guilty verdict is just another' way of saying that the law "justifies and demands” that they return a not-guilty verdict. However, because the Supreme Court’s more recent decision in Roby addresses the precise instruction at is *1054 sue here, further discussion of Hunter is unnecessary.

. Thompson's appellate brief does not make this specific argument, although the dissent does.

. The jury wrote and then struck through "prove or disprove.”

. The instruction's use in other cases is likely attributable to its inclusion in the model instructions produced by the Mississippi Judicial College. Mississippi Judicial College, Mississippi Model Jury Instructions, Criminal § 1:13 (2016). However, the only authority provided for the model instruction is a "But see” citation to Hunter, which expressly disapproved of a substantively indistinguishable instruction. See supra n.5. The Supreme Court has “point[ed] out that the model jury instructions are only guidelines and have not been adopted by [the Supreme] Court.” Baker & McKenzie LLP v. Evans, 123 So.3d 387, 408 (¶ 80) (Miss. 2013).