# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01042-COA

**TIMOTHY DEWAYNE TAYLOR A/K/A**                 **APPELLANT**
**TIMOTHY D. TAYLOR A/K/A TIMOTHY**
**TAYLOR**

**v.**

**STATE OF MISSISSIPPI**                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/09/2022 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | JEFFERSON DAVIS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/14/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McDONALD AND SMITH, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Timothy Taylor appeals his Jefferson Davis County Circuit Court jury convictions of

attempted murder in violation of Mississippi Code Annotated section 97-1-7(2) (Rev. 2014)[1]

---

[1] "Every person who shall design and endeavor to commit an act which, if accomplished, would constitute an offense of murder under Section 97-3-19, but shall fail therein, or shall be prevented from committing the same, shall be guilty of attempted murder and, upon conviction, shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict after a separate sentencing proceeding. If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than twenty (20) years in the custody of the Department of Corrections." Miss. Code Ann. § 97-1-7(2).

and two counts of possession of controlled substances: one for possession of cocaine in violation of Mississippi Code Annotated section 41-29-139(c) (Rev. 2016) and one for possession of methamphetamine, also in violation of Mississippi Code Annotated section 41-29-139(c) (Rev. 2016).[2] For the attempted murder conviction, Taylor was sentenced to a term of thirty years in the custody of the Mississippi Department of Corrections, with twenty years to serve and ten years of supervised post-release probation. Taylor was sentenced to serve three years in custody for each of the two possession convictions. Taylor's sentences were ordered to run consecutively to each other. On appeal, Taylor contends that the circuit court erroneously admitted evidence of prior bad acts that unduly prejudiced the outcome of his trial. After reviewing the evidence, and considering the arguments of counsel and relevant precedent, we affirm Taylor's convictions and sentences.

**Facts**

¶2. On May 3, 2019, Betty Taylor called law enforcement and reported that her son, Timothy Taylor, had threatened her and her daughter-in-law at her home in Jefferson Davis County. Betty said that Taylor accused her of taking his billfold and threatened to kill both women. Taylor left and went to the trailer on Betty's property that Betty owned where,

---

[2] "[I]t is unlawful for any person knowingly or intentionally to possess any controlled substance . . . . The penalties for any violation of this subsection (c) with respect to a controlled substance classified in Schedules I, II, III, IV or V, as set out in Section 41-29-113, 41-29-115, 41-29-117, 41-29-119 or 41-29-121, including marijuana or synthetic cannabinoids, shall be based on dosage unit as defined herein or the weight of the controlled substance as set forth herein as appropriate[.]" Miss. Code Ann. § 41-29-139(c) (Rev. 2022).

according to her, Taylor lived.

¶3.     The first two law enforcement officers to respond to the domestic disturbance call were Deputy Sheriffs Pat Barnes and Vernon Dampier. They had been manning a safety checkpoint, i.e., roadblock, and left in different patrol cars. Barnes arrived first. As shown on footage from Barnes's body-camera, Barnes approached the trailer's front door. Barnes identified himself as law enforcement, and Taylor, who was standing slightly inside the open doorway, asked who it was. Taylor then said, "I ain't going to jail," and he shot at Barnes, hitting him in his right thigh. Barnes radioed that he had been shot and Dampier arrived moments later. Although Dampier called for an ambulance, because of the severity of Barnes's injury, Dampier took Barnes to a hospital in Prentiss. Barnes was eventually air-lifted to Forrest General Hospital in Hattiesburg because he required a higher level of care.

¶4.     Approximately half an hour after Barnes was shot, other officers, including Investigator Tim Culpepper, arrived at the scene. Law enforcement surrounded the trailer and tried to peacefully coax Taylor out. But again, Taylor opened the front door and fired several shots. Law enforcement returned fire. After several hours, law enforcement from Jones County arrived with an armored vehicle that was used to ram the trailer's front door open. More shots were fired from inside the trailer. The armored vehicle turned and, in doing so, pulled out the front wall of the trailer. The vehicle then drove to the other end of the trailer and opened that wall as well. After further negotiation, Taylor threw a pistol out of the trailer and surrendered.

3

¶5. During their search of the premises, law enforcement officers found a .357 Magnum handgun on the kitchen table with seven spent rounds and one live round in the chamber. They also found two plastic bags containing white powdery substances that the Mississippi Forensic Laboratory tested and found to be 1.37 grams of cocaine and 0.79 grams of methamphetamine. The gun that had been thrown out of the trailer was a .25-caliber semi-automatic pistol that was empty. Because the bullet that struck Barnes went through his leg, the bullet was not retrieved from the scene; thus, it remained uncertain from which gun the bullet was shot.

¶6. A Jefferson Davis County grand jury indicted Taylor for attempted murder, aggravated assault on a law enforcement officer, possession of marijuana, possession of methamphetamine, and possession of cocaine. The trial was continued several times because of Taylor's psychiatric evaluations at Whitfield[3] and because Taylor's initial counsel was allowed to withdraw.

¶7. On August 5, 2022, prior to trial, the State moved to admit testimony that Taylor had been previously arrested. The State did not plan to introduce the specifics about the charges, what happened in those other cases, or any other details. The State only wanted to enter evidence of the fact that Taylor had been arrested by the sheriff's department in the past.[4]

_____

[3] Taylor was evaluated on August 17, 2020; September 22, 2021; and June 8, 2022.

[4] In its motion, the State sought to enter evidence that at the time of the incident, Taylor had been arraigned for a felony but was released on bond. However, at trial, the State did not enter any evidence concerning this arraignment or bond.

The State contended that this evidence showed Taylor had been taken to jail before and that he was released on bond, which he knew would or could be revoked if he were arrested. The State argued that this evidence was admissible under Mississippi Rule of Evidence 404 because the evidence revealed Taylor's motive for shooting Barnes.

¶8. On August 7, 2022, Taylor responded with his own motion in limine to preclude, among other things, any reference to Taylor's past criminal acts or convictions. Taylor reiterated his opposition in another motion in limine that dealt solely with the admission of prior-bad-acts evidence that he filed on September 7, 2022. On the second day of the trial, September 9, 2022, before testimony began, the circuit court granted the State's motion, stating that the bad acts in question (i.e., the fact that Taylor had been previously arrested) had a direct correlation to the events of this case.

¶9. At trial, the State called Culpepper, who confirmed what happened at the scene after his arrival. He specifically identified Taylor as the individual who fired the second round of shots at law enforcement officers who were trying to negotiate his surrender. Culpepper also confirmed that no other individual was found in the trailer. Culpepper was asked about Taylor's prior contacts with law enforcement:

> Q. And through the course of your investigation afterwards, did you ever determine that he had had contact with Jefferson Davis County Sheriff's Department in the past?
>
> A. From my understanding, he has been arrested numerous times in Jefferson Davis County.

On cross-examination, Taylor's attorney followed up on this topic. Referring to Barnes's

body-camera footage, defense counsel asked Culpepper:

> Q. And the alleged shooter is commenting after the shot was fired that he is not going back to jail; is that correct?
>
> A. That's correct.
>
> Q. Wouldn't you say that's indicative of his intent? He didn't want to go back to jail?
>
> A. Definitely didn't want to go back to jail.

Culpepper acknowledged that he did not know who was in the trailer at the time Barnes was shot because he and other law enforcement officers arrived over half an hour later.

¶10. Taylor's mother, Betty, testified about the threats her son had made to her that night and that he lived alone in the trailer on her property located across from her house. On cross-examination by Taylor's attorney, she also said that her son had been diagnosed with mental disorders:

> Q. Ms. Taylor, I know this must be very difficult for you, but I do have a couple of questions. Had Timothy Taylor ever been diagnosed with any mental disorders?
>
> A. Yes, he's been to Purvis three times. He was getting a check until he went to jail.
>
> Q. So he's adjudicated disabled, and he's been committed to the state hospital?
>
> A. Yes.

She further testified that her son was not the normal Timothy Taylor she knew "because he was sick" and had been for a while.

¶11. The State called Vernon Dampier, who joined the Jefferson County Sheriff's Department in 2017. Dampier testified about his familiarity with Taylor and his family:

> Q. Are you familiar with the Taylor's?
>
> A. Yes, ma'am.
>
> Q. And how do you know -- do you know Timothy Taylor, or did you know him before this night?
>
> A. Yes, ma'am.
>
> Q. All right. And how did you know him?
>
> A. I mean, just sometimes -- before I became a deputy, I knew him by seeing him around, and then when I became a deputy, he was incarcerated with us, and we spoke from time to time.

As the body-camera footage of Barnes's shooting was shown, Dampier identified the voices of Barnes and Taylor, identifying Taylor as the shooter.

¶12. The State also called Erick Frazure of the Mississippi Forensics Laboratory to identify the controlled substances that officers found at the scene, and Catrina Lockhart, the emergency room nurse at Jefferson Davis County Hospital who helped treat Barnes on the night of the shooting, to describe Barnes's wound and authenticate his medical records that were placed into evidence.[5]

¶13. The State rested, and after the court denied Taylor's motion for directed verdict, the only witness the defense presented was Taylor. He testified that he did not shoot Barnes.

---

[5] Although Barnes survived the incident, he did not testify because he died of other unrelated causes while the case was pending.

He said that he had no drugs in his personal possession that night and that law enforcement never dusted his hands for gunpowder residue, though he requested that they do so. Taylor claimed that he was asleep in the back room of the trailer when Barnes was shot and that he did not live there even though his mother said he did. Taylor also denied threatening his mother with a gun.

¶14. When asked about any interaction with Vernon Dampier, Taylor said:

> A.      I mean, I seen him around, but I ain't never known [him].
>
> Q.      You never interacted with him?
>
> A.      No, sir, never interacted with any police.
>
> Q.      He's never arrested you?
>
> A.      No, sir, I never been to jail. I never been in trouble my whole life.
>
> Q.      You have never been in trouble your whole life?
>
> A.      No, I'm 42-years old. I got a clean record.

At that point, the prosecutor approached the court and argued that Taylor had opened the door to questioning about prior arrests. The judge stated:

> He did ask him a question, but it's a legitimate question. The honest answer would have been to say yes, but he didn't. So he's opened the door when he said, "No, I haven't." So he's got to put it on the record now. I will allow it.

The defense objected, and the jury was excused. The judge wanted to hear Taylor's explanation to his answer of never being arrested before the jury heard it. The court also indicated that it assumed the State would be entering Taylor's entire criminal record.

However, the State decided not to ask Taylor anything further or enter any evidence of Taylor's criminal record.[6] Thus, the specific criminal conduct or "bad acts" that resulted in the arrests was never entered into evidence or presented to the jury. When the court brought the jury back in, the judge told them that Taylor wanted to explain his response to the question, "Have you been arrested before?" Taylor responded:

> THE WITNESS: Yes, sir, I have a clean record. I have been arrested on misdemeanors and false accusations, but I have never been convicted of any crime, is what I meant to explain to the jury.
>
> THE COURT: Thank you. Proceed with your cross examination, please.
>
> Q. Just so I'm clear, you are telling this jury that you have been arrested by Jefferson Davis County Sheriff's Department in the past?
>
> A. Yes, sir, mostly on writs and false accusations, but I never been convicted of any crime. I have a clean record.

¶15. The defense called no other witnesses, and the State called none in rebuttal. The court instructed the jury, including giving a limiting instruction that they were not to consider any testimony of previous arrests or bad acts as guilt of the charges for which Taylor was presently on trial. The parties presented their closing arguments, and the jury proceeded to deliberate. The jury found Taylor guilty of attempted murder and of possession of two controlled substances.

---

[6] Although the State said that it would only call Culpepper in rebuttal to establish that Taylor had been arrested on several occasions, it later decided not to call any rebuttal witnesses.

9

¶16.    The Court then instructed the jury that they needed to deliberate further to determine if they wanted to sentence Taylor to life imprisonment. Before deliberating, however, the court allowed Taylor's mother, Betty, to testify for mitigation purposes. She stated that Taylor was diagnosed with schizophrenia and had been to several hospitals for that condition. He had been prescribed medicine but was not taking it. The State called Felecia Barnes as an aggravation witness. She was married to Deputy Barnes, who since the incident had died of other causes. She testified that law enforcement was her husband's passion. She said Barnes knew Taylor because both of their families attended the same church, and Taylor often came and sat in the back. Barnes would frequently go and talk to him. Felecia said her husband was off work for six weeks because of his gunshot injury. The State also called Keedriona Barnes, Deputy Barnes's daughter. She was twenty-five years old and living in Hattiesburg when her father was shot. Her testimony was much the same as her mother's, saying how Barnes loved law enforcement work and knew Taylor's family.

¶17.    The jury deliberated but could not reach a unanimous verdict as to imprisonment for life. The court then sentenced Taylor to thirty years in the custody of the Mississippi Department of Corrections for the attempted murder conviction, with twenty years to serve and ten years of post-release supervision. For the convictions of counts two and three, the possession of a controlled substance counts, the court sentenced Taylor to serve three years in custody on each conviction. All sentences were set to run consecutively.

¶18.    On September 12, 2022, Taylor filed a motion for judgment notwithstanding the

verdict or, in the alternative, for a new trial. He raised several generic claims, such as allegations that the court erroneously overruled his motion for a directed verdict, that the court erroneously overruled his objections and motions and refused his jury instructions, and that the verdict was against the overwhelming weight of the evidence. That same day, the circuit court denied Taylor's motions.

¶19. On September 30, 2022, Taylor appealed, and he raises a single issue: whether the circuit court erroneously allowed evidence of prior bad acts that so prejudiced his case that a new trial is warranted.

## Discussion

¶20. "A trial judge has considerable discretion as to relevancy and admissibility of evidence and unless this judicial discretion is so abused as to be prejudicial to the accused we will not reverse on these grounds." *Harvey v. State*, 365 So. 3d 218, 224 (¶43) (Miss. 2023). "The relevancy and admissibility of evidence are within the discretion of the trial judge and will not be reversed unless that discretion has been abused." *Amos v. State*, 360 So. 3d 323, 330 (¶25) (Miss. Ct. App. 2023) (citing *Tidwell v. State*, 806 So. 2d 1146, 1148 (¶7) (Miss. Ct. App. 2002)). Thus, "unless the trial court abused its judicial discretion to the point of prejudicing the accused, this Court must affirm the trial court's ruling." *Id*.

¶21. Rule 404(b) of the Mississippi Rules of Evidence addresses the admissibility of past crimes or other bad acts of a defendant:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible
> to prove a person's character in order to show that on a particular occasion the

11

person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

MRE 404. "As clearly stated by M.R.E. 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." *Al-Fatah v. State*, 856 So. 2d 494, 500 (¶9) (Miss. Ct. App. 2003). However, such evidence may be admissible for other purposes. *Id.* An example of a permitted use is *Williams v. State*, 919 So. 2d 250, 255 (¶¶18-19) (Miss. Ct. App. 2005), where we held that a trial court did not abuse its discretion in a burglary trial by admitting evidence that the defendant had been previously arrested because the testimony of previous arrests was presented for the purpose of showing why the defendant's fingerprints were in the police department's fingerprint database. "Trial judges also have the discretion to admit evidence of other crimes or bad acts for reasons not listed in Rule 404(b)(2), like telling the complete story so as not to confuse the jury." *Amos*, 360 So. 3d at 332 (¶30).

¶22.    "However, prior to admitting the other-bad-acts evidence, a trial judge must filter the evidence through Mississippi Rule of Evidence 403." *Id.* Rule 403 provides:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

MRE 403. "Under Rule 403, when weighing admission of relevant evidence, a trial judge may exclude relevant evidence if its probative value is substantially outweighed by the

12

danger of unfair prejudice." *Amos*, 360 So. 3d at 332 (¶30). But "we may reverse only if the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party." *Page v. State*, 269 So. 3d 440, 448 (¶18) (Miss. Ct. App. 2018); *Weeks v. Weeks*, 989 So. 2d 408, 413 (¶21) (Miss. Ct. App. 2008).

## I. Applicability of Rule 404

¶23. The threshold question in this case is whether the testimony that Taylor had been previously arrested constitutes prior-bad-acts evidence subject to Rule 404. As noted above, prior-bad-acts testimony first must be evidence of "crimes, wrongs, or acts" introduced "for the purpose of showing that a person acted in conformity therewith." 4A Jeffrey Jackson, et al., *Encyclopedia of Mississippi Law* § 33:18 (3d ed. updated Oct. 2023). "[T]he prosecution may not introduce prior bad acts for the purpose of showing that the defendant has a propensity to engage in such conduct, that is, because he had done things like this before, he probably did it this time." In *Cole v. State*, 126 So. 3d 880, 884-85 (¶20) (Miss. 2013), the Mississippi Supreme Court noted:

> With only three exceptions not applicable in this case, a person's prior bad acts are not admissible *for the purpose of proving that he acted in conformity therewith on a particular occasion*. Stated another way, the prosecutor in this case was prohibited from using Cole's prior bad acts [(sexual misconduct with other victims)] to suggest to the jury that Cole had a bad character or bad character trait; and that he was acting in conformity with that bad character when he committed the acts for which he was on trial [(another sexual misconduct charge)]. Stated still another way, the prosecution may not introduce prior bad acts *for the purpose of showing that the defendant has a propensity to engage in such conduct, that is, because he had done things like this before, he probably did it this time.*

13

(Internal quotation marks omitted) (emphasis added).

¶24. Taylor contends that we should evaluate the "prior arrest" testimony in his case like we did the evidence of prior misconduct in *Campbell v. State*, 750 So. 2d 1280 (Miss. Ct. App. 1999). We disagree. In *Campbell*, we reversed and remanded a defendant's conviction for the sale of cocaine because extensive testimony of Campbell's *specific* prior crimes was presented to the jury. *Id*. at 1283 (¶13). For example, when asked how Campbell became a target of the drug sale operation, one witness testified that he had made a previous drug purchase from Campbell. *Id*. at 1282 (¶5). Another witness testified that a photograph of Campbell had come from "the other case file," "[the case file on] the other charge we have." *Id*. at (¶6). On redirect examination of that witness, the State went even further:

Q. Mr. Jones used the word "target" several times in his cross-examination, that y'all had targeted Frederick Campbell. Why was Frederick Campbell being targeted?

A. We had complaints and had one other purchase, one other sale.

*Id*. at (¶7). In *Campbell*, the jury heard testimony of specific criminal acts (other drug sales) that related to the charge for which Campbell was being tried (selling drugs). But the facts of Taylor's case are clearly distinguishable from those in *Campbell*. In Taylor's case, the jury only heard that Taylor had been previously arrested. No details of the prior arrests were presented. The State did not introduce evidence that Taylor had been arrested for previously shooting anyone or that he had a propensity to shoot to avoid being arrested. The testimony elicited gave the jury no details about the nature of the crimes for which Taylor had been

14

arrested. As previously noted, "prior bad acts" evidence is discussed in the context of evidence being used to show that a defendant acted in conformity with his prior conduct. In this case, no evidence of Taylor's prior bad acts was entered—only the acts of law enforcement in arresting him. A review of the admissibility of evidence under Rule 404 is fact-specific and necessarily case-by-case. In this particular case on these particular facts, simply telling the jury that Taylor had previously been arrested when that information formed the foundation for Taylor's identification by Dampier as discussed below is not the kind of "prior bad acts evidence" envisioned by Rule 404.

## II. *Application of Rule 404(b)*

¶25. Even if the testimony that Taylor had been previously arrested were considered Rule 404(b) "prior bad acts" evidence, the State argues that it falls within the exceptions of Rule 404(b)(2). First, the State contends that the testimony proves Taylor's motive for shooting Barnes, i.e., that because of prior arrests, Taylor was so intent on not going to jail that he shot at Barnes. However, Taylor argues that the crime of attempted murder as defined in Mississippi Code Annotated section 91-1-7(2) only requires a showing of "design and endeavor to commit an act which, if accomplished, would constitute an offense of murder . . . ." Because motive is not an element of the crime of attempted murder, Taylor contends that any questions about his prior arrests were irrelevant and inadmissible.

¶26. The State replies that the prosecution is always permitted to put on evidence of motive. It cites *De La Beckwith v. State*, 707 So. 2d 547, 579 (¶127) (Miss. 1997), where the

15

Mississippi Supreme Court held that Beckwith's letters showing support for segregation, hostility toward blacks, and involvement with the Ku Klux Klan were admissible to show Beckwith's intent or motive for his murder of Medgar Evers. The Supreme Court there stated, "Although the prosecution is not required to show motive, it is certainly entitled to do so in order to paint a clearer picture of the crime." *Id*. at 580 (¶130). Although we agree with this general principle, we are more persuaded by the State's alternative purpose for eliciting testimony of Taylor's prior arrests, namely that Dampier's prior arrest of Taylor supported Dampier's ability to recognize Taylor's voice on Barnes's body-camera and identify him as the shooter.

¶27. Mississippi recognizes that the testimony of a person who hears a voice is competent and legitimate to establish the identity of the speaker, especially when there is substantial other evidence of guilt. *Warren v. State*, 456 So. 2d 735, 737 (Miss. 1984). In *Lindsey v. State*, 279 So. 2d 913, 914 (Miss. 1973), the supreme court affirmed the admission of a victim's voice identification of her assailant even though the room was dark, and she could not recognize him by his physical appearance. She recognized his voice because he lived near her home, and she had heard him talk with others on several occasions over a period of two years. *Id.* In the case at hand, Taylor denied that he shot Barnes. But because Dampier knew Taylor's voice from the times he had arrested him, Dampier could identify Taylor as the individual shown on the body-camera as the individual shooting at Barnes. Consequently, the testimony was used to identify Taylor and is an exception to the Rule 404

16

prohibition of prior bad acts evidence.

¶28.    We also note that although Taylor initially testified that he had never been arrested by Dampier and that he had never been in jail, he later admitted that he had been arrested, but only for misdemeanors and "false accusations." Taylor's explanation was the last word the jury heard of the arrests, i.e. Taylor's testimony that he had a clean record. The State presented nothing in rebuttal, which supports the State's contention that the prior arrest testimony was intended only for limited permissible purposes.

### III.    *Application of Rule 403*

¶29.    In addition, Taylor has not sufficiently shown that he was so prejudiced by the admission of the prior arrest testimony that it outweighed the testimony's probative value. "In determining whether the prior-bad-acts evidence is admissible, a trial judge should filter the evidence through Mississippi Rule of Evidence 403 and determine whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice." *Friley v. State*, 366 So. 3d 959, 964 (¶17) (Miss. Ct. App. 2023). Taylor's cites *Gallion v. State*, 469 So. 2d 1247, 1249-50 (Miss. 1985), for the proposition that "evidence which is incompetent and inflammatory in character carries with it a presumption of prejudice." We agree, but in this case, the evidence does not rise to *Gallion*'s presumptively prejudicial level. In that case, Gallion was charged and convicted of armed robbery. *Id.* at 1248. When Gallion testified in his defense, the State questioned him at length about his prior illegal activities, including prior convictions for disorderly conduct, resisting arrest, possession of

17

marijuana, and gambling. *Id.* at 1249. The supreme court noted that because the jury, which was charged with setting Gallion's sentence, gave him life imprisonment, Gallion had shown harm by the admission of the irrelevant information. *Id.* at 1250. In Taylor's case, the State's questioning of prior bad acts was not as extensive or detailed as in *Gallion*, and was limited to whether Taylor had ever been arrested. Taylor himself was able to testify, without further impeachment or rebuttal, that his arrests were on minor matters and led to no convictions. Moreover, the jury did not impose upon him a life sentence as did the jury in *Gallion*. Thus, in this case, the limited questioning about Taylor's prior arrests does not meet the presumption-of-prejudice bar.

¶30. Even if the trial court determines that the prejudicial effect of certain evidence outweighs its probative value "under Rule 403, the exclusion of prejudicial evidence is permissive." *Ross v. State*, 954 So. 2d 968, 993 (¶44) (Miss. 2007). The trial court "is not obligated to exclude the evidence, but may do so at its discretion." *Id.*

> Unless the trial court based its decision on an erroneous view of the law, this Court is not authorized to reverse for an abuse of discretion absent a finding the trial court's decision was "arbitrary and clearly erroneous." We will not reverse simply because we think "the trial court was 'right or wrong' in its response."

*Thompson v. State*, 230 So. 3d 1044, 1054 (¶32) (Miss. Ct. App. 2017). In the case before us, the circuit court did not base its decision on an erroneous view of the law and did not act arbitrarily and capriciously. Accordingly, we find that the testimony of Taylor's prior arrests was more probative than prejudicial under Rule 403.

18

*IV.    Harmless Error*

¶31.    Finally, even though we find no error in the admission of questions limited to the fact that Taylor had been previously arrested, if the mention of a prior arrest were considered error, that error would be harmless. "An error is considered harmless when the weight of the evidence against the defendant was sufficient to outweigh the harm done by allowing admission of the evidence." *Bays v. State*, 344 So. 3d 303, 307 (¶12) (Miss. Ct. App. 2022) (internal quotation marks omitted).  "An error is harmless when it is apparent on the face of the record that a fair-minded jury could have arrived at no verdict other than that of guilty." *Havard v. State*, 928 So. 2d 771, 797 (¶54) (Miss. 2006).  In Taylor's case, the State presented substantial evidence to support Taylor's conviction, including the body-camera footage, the testimony of Dampier who identified Taylor as the shooter, Betty's testimony that Taylor lived in the trailer alone, and the fact that no one else was found at the scene. There is little likelihood that the outcome of the trial would have changed had no mention of Taylor's previous arrests been made.  Thus, any error was harmless.

## Conclusion

¶32.    We find no abuse of discretion by the circuit court in the admission of the evidence that Taylor had been previously arrested, and we affirm Taylor's convictions and sentences.

¶33.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**